**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PATRICIA HEISSER METOYER,
    *Plaintiff-counter-*
    *defendant-Appellant,*

    v.

LEONARD CHASSMAN, an individual;
JOHN MCGUIRE, an individual,
    *Defendants-Appellees,*

SCREEN ACTORS GUILD, INC., a
corporation,

    *Defendant-counter-*
    *claimant-Appellee.*

No. 04-56179

D.C. No.
CV-03-08438-JFW

OPINION

Appeal from the United States District Court
for the Central District of California
John F. Walter, District Judge, Presiding

Argued and Submitted
June 6, 2006—Pasadena, California

Filed September 26, 2007

Before: Dorothy W. Nelson, Johnnie B. Rawlinson, and
Carlos T. Bea, Circuit Judges.

Opinion by Judge D.W. Nelson;
Partial Concurrence and Partial Dissent by Judge Bea

## COUNSEL

Marco Simons, Hadsell & Stormer, Inc., Pasadena, California, for the appellant.

Anne Richardson, Hadsell & Stormer, Inc., Pasadena, California, for the appellant.

Rick Hicks, Hicks & Hicks, Beverly Hills, California, for the appellant.

Eugenia Hicks, Hicks & Hicks, Beverly Hills, California, for the appellant.

Catherine B. Hagen, O'Melveny & Myers, LLP, Newport Beach, California, for the appellees.

Eric J. Amdursky, O'Melveny & Myers, LLP, Newport Beach, California, for the appellees.

Renee M. Spigarelli, O'Melveny & Myers, LLP, Newport Beach, California, for the appellees.

Ryan W. Rutledge, O'Melveny & Myers, LLP, Newport Beach, California, for the appellees.

---

## OPINION

D.W. NELSON, Senior Circuit Judge:

In May, 2001 the Screen Actors Guild ("the Guild") fired Dr. Patricia Heisser Metoyer ("Metoyer"), an African-American, after PricewaterhouseCoopers ("PwC") concluded Metoyer authorized payment in excess of $30,000 of funds available for Guild use to friends, business partners, and her husband's production company. Metoyer responded by bringing multiple claims against the Guild, including federal race discrimination and retaliation claims under 42 U.S.C. § 1981 and state law discrimination claims under the California Fair Employment and Housing Act ("FEHA"). The district court granted summary judgment in favor of the Guild on all claims. We reverse in part and find that Metoyer has raised a triable issue of fact on all but one of the federal and state race discrimination and retaliation claims.[1]

## I.   FACTUAL AND PROCEDURAL BACKGROUND[2]

### A.   The Hiring Process

In March 1998, Metoyer applied for employment with the Guild listing the position she desired as "Affirmative Action

---

[1]In a separate memorandum disposition, we affirm the district court's (1) denial of plaintiff's motion for reconsideration, and (2) denial of plaintiff's motion to re-tax costs. We also dispose of defendant's argument that plaintiff's employment contract was void and, therefore, as a matter of law cannot sustain plaintiff's 42 U.S.C. § 1981 claims.

[2]In our statement of the facts, we draw all reasonable inferences in favor of Metoyer. *See, e.g.*, *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1022 n.1 (9th Cir. 2006).

Director." At that time, the Guild did not have an "Affirmative Action Director" position; it had two "Executive Administrator of Affirmative Action" positions, one in New York City and one in Hollywood.[3] Metoyer was contacted by Kathryn Nirschl ("Nirschl"), the Guild's Executive Administrator of Human Resources and invited to interview. Nirschl informed Metoyer that although the title of the position was that of "executive administrator", she would in fact be the "director of affirmative action." Nirschl assured Metoyer that the salary would increase up to $89,000 once the position changed to that of "director."

Metoyer also interviewed with John C. Barbadian, the national director of human resources at the time, who told her that because the affirmative action department was in such disarray at SAG, the Guild needed a national director and that her title would be changed to that of "director." Finally, during the interview with Richard Nasur, president of the national board of directors of SAG, he referred to the position that Metoyer was applying to as that of "director."

On April 27, 1998, after several rounds of interviews, Nirschl sent Metoyer a letter stating:

> It is a pleasure to confirm an offer of employment to you on behalf of the Screen Actors Guild. The Guild is a dynamic organization providing new challenges and increasing responsibility.
>
> Your current offer of employment is for the position of Executive Administrator, Affirmative Action with an annual salary of $65,000 payable on a weekly basis. This assignment will begin on Tuesday, May 26, 1998. As an employee of the Screen Actors Guild, you are entitled to an extensive bene-

---

[3]"SAG Hollywood" was considered the national headquarters and all of the national director positions were in this office.

fits package including health, dental, vision, a pension plan, a credit union, and many other valuable benefits. Your eligibility for these benefits will commence August 1, 1998.

In a letter sent to Nirschl on May 6, 1998, Metoyer confirmed her "acceptance of the position of Executive Administrator, Affirmative Action, with all the terms and conditions as stated in [Nirschl's] letter dated April 27, 1998."

Throughout her tenure at the Guild, the nameplate on Metoyer's door read, "Patricia Heisser-Metoyer National Executive Director Affirmative Action" and many of her co-workers and SAG members referred to her as the national director. Soon after Metoyer was hired, Linda Shick, the new National Director of Human Resources who replaced Barbadian, again informed her that the Guild planned to appoint 30 directors and that her position of national director of affirmative action would be one of them. Within a few months, all of the planned appointments to national director positions were granted except for Metoyer's.

In August, 1999 Metoyer petitioned the Guild's Senior Staff to create a National Director of Affirmative Action position. John McGuire ("McGuire"), then the Guild's Acting Executive National Director, denied her request "because the Affirmative Action department was not structured to function nationally and, consequently, there was no need for a national director." Schick explained to Metoyer that SAG had never had a person of color higher than the position she currently held and that it would be very difficult for senior staff to accept new ways. Specifically, she stated, "There are no people of color on senior staff, and it's very unlikely that there will be."

## B. Metoyer's Role in Relaying Discrimination Complaints by SAG Employees

Almost immediately after Metoyer was hired, she began to be approached by minority employees within the Guild with

complaints of racial discrimination. Several minority employees complained to Metoyer that the Guild's senior staff, including Schick, Leonard Chassman, Metoyer's immediate supervisor and the Guild's Hollywood Executive Director, and McGuire, (collectively "senior management"), were discriminating on the basis of race in making promotions, assigning work and pay. Metoyer assiduously related these complaints to senior management and others throughout her time at the Guild.

Schick and Chassman responded to these complaints with blatantly racist comments. In response to complaints that African-Americans were being kept in low-paying jobs, Shick stated: "I'm keeping them there because I want to keep an eye on them because black people like to party and eat and don't do their work." Chassman's response was: "They ought to be glad they have a job." In another meeting sometime in 1998 in which Metoyer put forth complaints of minority employees, Chassman responded, "All of these people are lazy and malingerers. Is that something special with African-Americans that they have to socialize all the time and they are never happy? They should be happy to have this job." Many of the employees told Metoyer that they were retaliated against after she brought their complaints to the attention of senior management.

Schick warned Metoyer that she would not go far in the organization because she was too outspoken and SAG senior management did not tolerate people of color talking back the way she did. Schick commented, "You talk more than other black people here. The rest of them are like — they're like a tribe or something. They hang around together, and they don't talk. You're unusual. You talk too much." Metoyer became concerned about her job because of the actions of senior management against other minority employees who brought complaints. Metoyer asked Chassman whether she was "too outspoken" and he responded affirmatively, explaining that

McGuire did not like her because she was too outspoken in attempting to implement affirmative action policies.

In 2000, SAG cut Metoyer's budget and there was an increase in racial discrimination complaints by SAG employees which culminated in the circulation of an anonymous letter written by SAG minority employees. Chassman accused Metoyer of "fomenting" discontent and unrest amongst SAG employees regarding racial discrimination and encouraging them to come forward with their race discrimination complaints.

## C.   Metoyer's Findings of Irregularities in IACF Grants

In addition to relaying complaints of racial discrimination, Metoyer discussed with senior management the concerns of guild members and herself about irregularities in several IACF grants. In relevant part, Metoyer's declaration states:

> From the time I was hired and throughout my employment, I regularly questioned the allocation of funds on several grants that are mandated to have Affirmative Action components and projects in them. I continuously complained to SAG senior staff about irregularities in certain IACF grant funds (Brakefield, Ward, and Jensen projects) for the following reasons:
>
> A.   *Shawna Brakefield:* Ms. Brakefield was paid for travel for staff and her husband out of IACF funds and was an *independent contractor* who was given a suite of offices at the Guild rent-free and access to telephones. She was also paid $85,000 as a salary while as an independent producer [she] entered competitions at festivals with her personal projects while she was representing the Guild (obvious conflict of interest). She also paid for her husband's travel out of these funds. The Board of

Directors complained that she never included protected group members in the festivals for outreach . . . only her husband and her staff. She was never audited in spite of numerous complaints. She received in excess of $1,000,000 without being audited and did not account for the spending of the money appropriately. She also spent IACF money to print several thousand pictures of herself as [a] Charlie's Angel and her staff and mailed them to promote her personal production company, Brakefield Productions. IACF funds are primarily to promote affirmative action activities. I complained to Leonard Chassman and Jonn McGuire because members asked me to complain. Nothing was ever done.

B. *Sharon Jensen:* Ms. Jensen was responsible for the "Non-Traditional Casting" project which was funded for 10 years by SAG and IACF, and was never audited. She was funded to set up a database for members — the same type SAG provides for free through my department. In 1992, she had 4,000 members and non-member stage actors and no protected group members. Members complained and asked her to submit an accounting of the grant money for the past 10 years. She never submitted a report to them and received another $96,000 lump sum payment in September 2000. I complained to Leonard Chassman and John McGuire because members asked me to complain on their behalf. Nothing was ever done.

C. *Paul Ward:* Mr. Ward was an independent contractor who was paid over $200,000 to do a feasibility study which was to be completed in one year. However, after three years, Mr. Ward never submitted a report. IACF funds are to go to educational institutions or 501(c)(3) organizations, not to independent contractors. Members complained to me, I

reported their complaints to John McGuire and Leonard Chassman. Nothing was ever done.

While affirmative action IACF grants were under very close scrutiny, these other grants went for years without any scrutiny or accountability whatsoever. Brakefield, Ward and Jensen were receiving large grants from IACF year after year while the affirmative action department, for which IACF had allocated funds for affirmative action activities, was being gutted. John McGuire was a senior staff member, a trustee on the board of IACF, and a mentor to these three grant recipients.

She informed the senior staff that she intended to take her findings to SAG's national board.

## D. The Fraudulent Equal Employment Opportunity Report (EEO-1)

In fall 2000, an employee in the Guild's Human Resources department, Valerie Quetel ("Quetel"), suspected Shick was preparing a fraudulent disclosure to the Equal Employment Opportunity Commission (the "EEO-1 Report"). In Quetel's view, the EEO-1 report overstated the number of racial minorities the Guild employed in high-level positions. Quetel told Metoyer the EEO-1 report was fraudulent, and provided Metoyer with a copy of the report. Metoyer compared the EEO-1 report's listing of high-level employees with an organization chart, and concluded that the Guild was, in fact, overstating the number of racial minorities in high-level positions.

At a department head meeting in late 2000 attended by McGuire and Chassman, Metoyer confronted Shick about the EEO-1 Report. During the meeting, Chassman sided with Shick and criticized Metoyer as being "out of line." Quetel's declaration states that after the meeting she heard Shick repeatedly say, "[t]hat bitch. I'm going to get that bitch."

After the meeting, Metoyer met privately with Chassman and told him that she planned to disclose the fraudulent EEO-1 Report to the Guild's plenary council, when it next met in April 2001. As a result of the budgets cuts in her department in 2000, Metoyer lacked the money to hire an employee to help her administer IACF grants. She therefore entered into written agreements with Loyola Marymount University ("LMU"), whereby LMU agreed to hold grant funds in "escrow" for Metoyer. LMU agreed to pay out "escrowed" grant funds to researchers, project coordinators, and vendors, upon Metoyer's order.

## E.    Investigation into Metoyer's Use of IACF Funds

Between July and September 2000, Metoyer caused the Guild to transfer approximately $120,000 in IACF grant funds to LMU by ordering the Guild to pay several invoices on LMU letterhead and listed LMU as the recipient of the funds. Some of these invoices were created and submitted by LMU, others by Metoyer. Metoyer told Chassman of her plan to escrow the funds at LMU and received his approval.

In November or December 2000, Sofia Banks, a temporary employee at the Guild, discovered a suspicious-looking invoice and check request in Metoyer's box. The check request was signed by Metoyer, and ordered a payment of $10,736 in Guild funds to LMU. In describing the use to which the funds were put, both documents listed seven events purportedly scheduled by the Affirmative Action staff in August 2000. Banks did not recall any of the seven events taking place. Banks showed the invoice and check request to another employee in the Affirmative Action department, Sylvia Henriquez; Henriquez shared Banks' suspicion that the seven events listed on the invoice and check request had never taken place. Henriquez, in turn, relayed her suspicion to Elaine Gram, an Affirmative Action department staff member. Gram knew the seven events had not occurred because, as a member of the Affirmative Action staff, she would have

known about events planned by her department. Gram, Henriquez, and Banks decided to take the matter to the Guild's in-house counsel, Vicki Shapiro.

Gram turned over the invoice and check request to Shapiro. Because the invoice and check request transferred funds to LMU, and one of Metoyer's employees, Celine Bae, had worked at LMU during the month of August, Gram found Metoyer's check request questionable. In addition to giving the invoice and check request to Shapiro, Gram informed Shapiro that Metoyer had earlier escrowed IACF grant funds with LMU, as described above.

Shapiro contacted Chassman, and together they approached McGuire, who in addition to being the Guild's highest-ranking employee, was a member of IACF's Board of Trustees. Based on the invoice, check request, and Gram's statement that Metoyer had escrowed IACF grant funds with LMU, McGuire was concerned that Metoyer might have mishandled IACF grant funds. In January 2001, McGuire, after "consultation" with Chassman, turned the invoice over to the IACF, and informed Bruce Dow, at the IACF, of his suspicions. On January 9, 2001, McGuire met with Dow, Leo Geffner (the Guild's outside counsel), and three other IACF trustees. McGuire informed all present of the invoice and the Guild's suspicions.

On January 18, 2001, the IACF held a regularly-scheduled board meeting, where the trustees discussed, in general terms and without naming Metoyer, the need for greater accountability of grant funds. During a teleconference on January 23, 2001 the board voted to retain PwC to investigate all of its outstanding grants.[4] Metoyer was not invited to this meeting or provided an opportunity to explain how she was properly

---

[4]This was the first audit that had been done to anyone in the history of SAG. Ultimately, PwC would investigate 26 of the Guild's IACF grants.

administering the IACF grants through the partnership with LMU.

By March 19, 2001, PwC had nearly completed its investigation, finding Metoyer had ordered the Guild to escrow roughly $120,000 in IACF grant funds with LMU and preliminarily concluding Metoyer ordered LMU to pay two of her current employees, Peter Nguyen and Celine Bae; one former employee, Rachelle Bolding; and her husband IACF grant funds without disclosing their identities to the Guild.[5]

(Text continued on page 13155)

---

[5]PwC's investigation focused on four payments:

*Payment #1 — $27,155 in IACF Grant Funds for the Skills Bank Reorganization*

On July 25, 2000, Metoyer authorized the transfer of $27,155 from the Guild's IACF trust account to LMU for LMU's work on the Skills Bank Reorganization project. Metoyer's undisputed testimony is that she caused LMU to pay $5,000 of these funds to Peter Nguyen for "legal consultation services." At the time, Nguyen was a Guild employee. Nguyen received this payment for researching whether it was legal of Metoyer to continue using a Skills Bank, which helped her find jobs for minority actors. Nguyen concluded the Skills Bank was legal and orally presented his conclusion to the Guild.

PwC found this payment to be improper because (1) Nguyen was not a licensed attorney and (2) it could not verify that Nguyen did anything to earn the money.

*Payment #2 — $20,000 in IACF Grant Funds for the "Casting the American Scene" and "Performers with Disabilities" Projects*

On September 14, 2000, Metoyer submitted two check requests to the Guild for a total of $20,000 in IACF grant funds. On September 21, 2000, Metoyer approved payment of her own check requests, thereby causing the Guild to transfer $20,000 in IACF grant funds to LMU. The check requests Metoyer submitted to the Guild indicated the purpose of the payment was for a "research coordinator" and "research associate" on the "Casting the American Scene" and "Performers with Disabilities" grants, respectively. The check request, however, did not include the identity of either the research coordinator or the research associate.

On October 30, 2000, with Metoyer's authorization, LMU paid this same $20,000 to Bolding, a friend and former employee of Metoyer at the Guild. PwC concluded that this payment was improper because (1) Bolding was Metoyer's business partner in an event-planning firm, PRC, which derived its name from the first initials of Patricia Metoyer, Rachelle Bolding, and Celine Bae (2) Metoyer's check requests to the Guild did not identify Bolding as the recipient, and (3) there was no documentation that Bolding did any work for the $20,000.

Metoyer disputes PwC's conclusion that Bolding was her business partner and the suggestion Bolding was not required to perform any work for the $20,000 payment. There is no dispute, however, that (1) the 'P" in PRC was derived from Metoyer's first name, (2) Metoyer contributed several hundred dollars to PRC's startup, and (3) the check requests Metoyer submitted to the Guild did not identify Bolding as the recipient of the grant funds. Likewise, there is no dispute that Bolding used the $20,000 payment to fund PRC's startup.

*Payments #3 and #4 — $10,736 of Guild Funds and $2,197 of IACF Grant funds to LMU on the "Family Fun Fest"*

On or about August 9, 2000, Metoyer ordered Bolding to create an invoice from LMU charging the Guild $10,736 for seven events that did not take place due to a Guild strike. Metoyer then ordered payment of $10,736 in Guild funds to LMU based on a check request listing these same seven events.

Metoyer ordered LMU to disburse this $10,736 to vendors who put on the Family Fun Fest she put on in lieu of the cancelled events. Specifically, Metoyer ordered LMU to pay Bae, a Guild employee, $2,599 for her work planning the Family Fun Fest picnic. At the time, Bae was also drawing her regular salary from the Guild. Metoyer also ordered LMU to pay $2,500 to Patois Productions for arranging entertainment at the Family Fun Fest. Although not apparent on the face of the invoice submitted to LMU, "Patois Productions" is Metoyer's husband's production company; $500 of the $2,500 payment went directly to Metoyer's husband as a finder's fee.

The $10,736 in Guild funds transferred to LMU on the basis of the invoice Metoyer ordered Bolding to fabricate did not cover the total cost of the Family Fun Fest. Accordingly, LMU sent

PwC also found the payments to Nguyen and Bolding questionable because it found no documentation indicating they had provided anything of value to the IACF or the Guild in exchange for their respective payments. PwC sent a report containing these preliminary conclusions to Bruce Dow at IACF, who then told McGuire, Chassman, and Geffner of PwC's findings.

On March 22, 2001, Metoyer attended a meeting with members of senior management including Chassman, McGuire, Bruce Dow, Alice Ortega and two individuals she

---

Metoyer an itemized invoice for the total cost of the Family Fun Fest. This invoice showed the $2,599 to Bae, the $2,500 to Patois Productions, payments to persons unrelated to Metoyer, and an outstanding balance of $2,197 for Family Fun Fest expenses. To avoid submitting this invoice to the Guild, Metoyer personally fabricated an invoice for $2,197 from LMU for a "reception for Dr. George Gerbner" by pasting this description on LMU letterhead. No such reception for Dr. Gerbner occurred. Rather, Metoyer explains Dr. Gerbner, despite not being in attendance, was honored at the Family Fun Fest. Dr Metoyer then prepared a check request ordering the Guild to pay $2,197 to LMU out of the IACF trust account to cover the balance of the Family Fun Fest expenses.

PwC concluded the payment to Bae was improper because (1) Bae "appeared to have received double compensation . . . [with] Dr. Metoyer's approval and assistance" and (2) Metoyer used false invoices to cause the Guild to transfer the money to LMU. Metoyer claims the double payment was proper because Bae was using "comp time" when she worked on the Family Fun Fest. Metoyer, however, admits telling Bolding to fabricate the first invoice and that she personally fabricated the second.

PwC concluded the payment to Patois Productions was improper because (1) Metoyer used false invoices to hide the payment from the Guild, and (2) Metoyer never submitted the Patois Productions invoice to the Guild's accounting department. Here, there is a triable issue of fact as to whether the Guild's accounting department received the Patois Production invoice because the invoice bears a time stamp that Metoyer states is the same as that used by the Guild's accounting department.

was introduced to for the first time as representatives of PwC. Metoyer was told that the meeting was set up so that she could discuss her complaints about ongoing racial discrimination, the fraudulent EEO-1 report and the irregularities she found in the IACF funding. Instead of being allowed to express her concerns, Metoyer was "cross-examined" by the two PwC auditors about her use of IACF funds. This interview was a violation of a SAG protocol that, if at any time there was a question about a grant Metoyer was administering, she would be contacted by Alicia Ortega of the IACF with specific questions. This was the process followed on prior occasions in connection with Metoyer's grant proposal. Nevertheless, Metoyer cooperated. Over the course of several hours, the auditors asked Metoyer about the transactions in question and presented her with copies of the relevant invoices and check requests. Metoyer acknowledged escrowing IACF grant funds with LMU and authorizing LMU to disburse both Guild and IACF funds to two current Guild employees, one former Guild employee, and her husband's production company. Metoyer also admitted fabricating invoices on LMU letterhead that had the effect of concealing from the Guild the identity of those receiving Guild funds and IACF grant funds.

During the interview, Metoyer complained to McGuire of race discrimination and reiterated complaints that Brakefield, Jensen, and Ward were misusing funds but had never been audited. Following the meeting, McGuire was prepared to terminate Metoyer's employment immediately. He decided, however, to suspend Metoyer with pay, until he could investigate her complaints of race discrimination and harassment. He retained a lawyer from O'Melveny & Myers to do so.

## F.   Termination of Metoyer's Employment with SAG

The next day, March 23, 2001, Metoyer was summoned to McGuire's office regarding a "personnel matter." When Metoyer arrived, Chassman was present. Metoyer asked to

consult with her attorney before continuing. Later that day, Chassman delivered a letter suspending Metoyer's employment with pay. The suspension prevented Metoyer from speaking at the April, 2001, plenary at which time she planned to voice her concerns about the chronic race discrimination complaints against Senior Staff, the fraudulent EEO-1 reports, the Brakefield, Jensen, and Ward IACF grants, the budget cuts, the failure to confirm her title, and Senior Staff's resistance to Metoyer's performance of her affirmative action duties.

On May 17, 2001, the lawyer from O'Melveny & Myers reported to McGuire that they were unable to make any findings regarding Metoyer's claims of racial discrimination and harassment because Metoyer refused to participate in the investigation. On May 30, 2001, McGuire terminated Metoyer's employment in a letter stating:

> The Guild is terminating your employment due to your unsatisfactory performance as Executive Administrator of the Guild's Affirmative Action Department as set out in greater detail below. . . .
>
> The Guild has concluded, based on the findings and results of the investigation and audit by PWC, that you committed a number of serious acts of misconduct in administering the IACF grants. PWC concluded that (1) "friends, relatives, and business partners received payment from Loyola Marymount University;" (2) "Some invoices were manipulated to disguise the purpose of the payment"; and (3) "Some invoices were prepared by SAG employees, not the researchers."

## II.  STANDARD OF REVIEW

We review de novo the district court's grant of summary judgment to "determine, viewing the evidence in the light

most favorable to the nonmoving party, whether there are any genuine disputes of material fact and whether the district court correctly applied the relevant substantive law." *Morrison v. Hall*, 261 F.3d 896, 900 (9th Cir. 2001) (citation omitted). "We require very little evidence to survive summary judgment in a discrimination case, because the ultimate question is one that can only be resolved through a 'searching inquiry' - one that is most appropriately conducted by the factfinder, upon a full record." *Lam v. University of Hawaii*, 40 F.3d 1551, 1564 (9th Cir. 1994) (citation and alteration omitted).

## III.   DISCUSSION

### A.   Applicable Law

[1] In analyzing Metoyer's claims under § 1981, we apply "the same legal principles as those applicable in a Title VII disparate treatment case." *Fonseca v. Sysco Food Servs. of Ariz. Inc.*, 374 F.3d 840, 850 (9th Cir. 2004) (citation omitted). Typically, we apply the burden-shifting framework established in *McDonnell Douglas*.[6] *See Fonseca*, 374 F.3d at 850. But we have also held that "although the *McDonnell Douglas* burden shifting framework is a useful tool to assist at the summary judgment stage . . . nothing compels the parties to invoke the *McDonnell Douglas* presumption." *McGin-*

---

[6]*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). At the first step of *McDonnell Douglas*, the plaintiff must establish a prima facie case of discrimination or retaliation. If the plaintiff makes out her prima facie case of either discrimination or retaliation, the burden then "shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its allegedly discriminatory [or retaliatory] conduct." *Vasquez v. County of Los Angeles*, 349 F.3d 634, 640 (9th Cir. 2003). Finally, at the third step of *McDonnell Douglas*, if the employer articulates a legitimate reason for its action, "the presumption of discrimination drops out of the picture, and the plaintiff may defeat summary judgment by satisfying the usual standard of proof required . . . under Fed. R. Civ. P. 56(c)." *Cornwell*, 439 F.3d at 1028 (citations and internal quotation marks omitted).

*est v. GTE Service Corp.*, 360 F.3d 1103, 1122 (9th Cir. 2004) (citation and internal quotation marks omitted). Instead, "when responding to a summary judgment motion . . . [the plaintiff] may proceed by using the *McDonnell Douglas* framework, or alternatively, may simply produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated [the employer]." *Id.* (citation omitted). "When the plaintiff offers direct evidence of discriminatory motive, a triable issue as to the actual motivation of the employer is created even if the evidence is not substantial." *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998); *see also Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994) (concluding that on summary judgment, "[t]he requisite degree of proof necessary to establish a prima facie case . . . is minimal and does not even need to rise to the level of a preponderance of the evidence").

**[2]** In a Title VII discrimination case, even an employer who can successfully prove a mixed-motive defense, i.e., he would have made the same decision regarding a particular person without taking race or gender into account, does not escape liability. *See* 42 U.S.C. § 2000e-5(g)(2)(B); *see also Costa v. Desert Palace, Inc.*, 299 F.3d 838, 857 (9th Cir. 2002) (en banc), *aff'd by*, *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003) (explaining that in a Title VII discrimination case, "the employer will escape the imposition of damages and any order of reinstatement, hiring, promotion," but will still be "liable . . . for attorney's fees, declaratory relief, and an order prohibiting future discriminatory actions"). Therefore, the mixed-motive defense, even if proven as an undisputed fact, does not provide a basis for summary judgment in a Title VII case. *See Dominguez-Curry v. Nevada Transp. Dept.*, 424 F.3d 1027, 1041-42 (9th Cir. 2005).

Metoyer, however, brought her claims under § 1981. The appellee contends that based on the plain language of the Civil Rights Act of 1991, the amendment eliminating the mixed-motive defense does not apply to any cause of action

brought under § 1981. Therefore, if the Guild "can prove that, even if it had not taken [race and] gender into account, it would have come to the same decision regarding a particular person[,]" then it has an affirmative defense to a cause of action for discrimination and retaliation under § 1981. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 242 (1989).

To support this contention, the appellees rely on the Eleventh Circuit case of *Mabra v. United Food & Commercial Workers Local Union No. 1996*, 176 F.3d 1357 (11th Cir. 1999). The Eleventh Circuit in *Mabra* determined that the mixed-motive defense applied to causes of action under § 1981. The court reasoned that in the 1991 Civil Rights Act, Congress amended Title VII to eliminate the mixed-motive defense but when Congress amended § 1981 in the same Act, it did not address the applicability of the mixed-motive defense. From this congressional silence, the court concluded that the mixed-motive defense continued to apply to causes of action brought under § 1981. *Id.* at 1358. The Eleventh Circuit's reasoning relies on the faulty premise that the mixed-motive defense applied to causes of action brought under § 1981 prior to the Civil Rights Act of 1991. Whatever the applicability of the mixed-motive defense to liability in Eleventh Circuit case law prior to the Civil Rights Act of 1991, we have never held that an employer's mixed-motive acted as a complete defense to liability from causes of action brought under § 1981.

Instead, prior to the Civil Rights Act of 1991, we held that a defendant in a Title VII suit can avoid damages in the form of back pay or retroactive award of appointment, promotion or seniority if she can establish "by 'clear and convincing evidence' that even in the absence of discrimination the rejected applicant would not have been selected for the open position." *Marotta v. Usery*, 629 F.2d 615, 617-18 (9th Cir. 1980); *see also Jauregui v. City of Glendale*, 852 F.2d 1128, 1136-37 (9th Cir. 1988) (applying the *Marotta* standard at the damages phase when a plaintiff sought to be awarded a position retro-

actively); *Fadhl v. City and County of San Francisco*, 741 F.2d 1163, 1166 (9th Cir. 1984) (applying the *Marotta* standard to the damages phase of a case when a plaintiff sought back pay and an order of reinstatement); *Felton v. Trustees of California State Universities and Colleges*, 708 F.2d 1507, 1509 (9th Cir. 1983) (applying the *Marotta* standard to a case in which the plaintiff sought the remedies of retroactive appointment and back pay) *LULAC v. City of Salinas Fire Dept.*, 654 F.2d 557, 558 (9th Cir. 1981) (applying the *Marotta* standard to the damages phase of a case in which the plaintiff that sought to be awarded a position retroactively at the damages phase). Notably, we never held that an employer's mixed-motive acted as a defense to liability.

During the period prior to the Civil Rights Act of 1991, we did not once address the applicability of a mixed-motive defense to liability or damages to causes of actions brought under § 1981. This was likely the result of the fact that plaintiffs rarely brought employment discrimination claims solely under § 1981. Nonetheless, at the time that we were applying the mixed-motive defense to damages in Title VII cases, we held in cases that brought both Title VII and § 1981 claims that "[t]he same standards are used to prove both claims, and facts sufficient to give rise to one are sufficient to give rise to the other." *Lowe v. City of Monrovia*, 775 F.2d 998, 1010 (9th Cir. 1985) (citation omitted). Therefore, by extension of this holding, the mixed-motive defense to damages applied to claims brought under both Title VII and § 1981.

In *Price Waterhouse*, the Supreme Court determined in a Title VII discrimination suit that a mixed-motive defense to liability was applicable. Under the *Price Waterhouse* standard, "an employer shall not be liable if it can prove that, even if it had not taken [the impermissible characteristic] into account, it would have come to the same decision regarding a particular person." *Price Waterhouse*, 490 U.S. at 242. This standard obviously conflicted with the standard established in the Ninth Circuit in which an employer's mixed-motive only

acted as a defense to damages, not to liability. Importantly though, the plaintiff in *Price Waterhouse* did not bring a § 1981 claim and the Court never addressed the applicability of the mixed-motive defense to liability for a claim brought under § 1981. After the decision in *Price Waterhouse*, neither we nor the Supreme Court ever applied the *Price Waterhouse* standard to a claim brought under § 1981. In addition, subsequent to *Price Waterhouse*, we never determined that the legal principles under Title VII continued to apply to claims brought under § 1981 in light of the changes to the Title VII standard.

Two years after the Supreme Court's decision in *Price Waterhouse,* Congress amended Title VII. This amendment was in direct response to the Supreme Court's interpretation of Title VII as including a mixed-motive defense to liability. The House Committee on the Judiciary stated in its Report on the Civil Rights Act of 1991:

> The Court's holding in Price Waterhouse severely undermines protections against intentional employment discrimination by allowing such discrimination to escape sanction completely under Title VII. Under this holding, even if a court finds that a Title VII defendant has clearly engaged in intentional discrimination, that court is powerless to end that abuse if the particular plaintiff who brought the case would have suffered the disputed employment action for some alternative, legitimate reason.

H.R. Rept. 102-40(II) at 18 (1991), *reprinted in* 1991 U.S.C.C.A.N. 549. For these reasons Congress amended Title VII "to restore the rule applied by the majority of the circuits prior to the Price Waterhouse decision that any discrimination that is actually shown to play a role in a contested employment decision may be the subject of liability." *Id.* Therefore, the pre-*Price Waterhouse* Ninth Circuit standard was restored

in which there was only a mixed-motive defense to damages, not to liability.[7]

**[3]** Since the Supreme Court in *Price Waterhouse* only applied the mixed-motive defense to a discrimination claim brought under Title VII, there was no need for Congress to amend § 1981 to eliminate a defense never held applicable. The Supreme Court had never held that the Title VII legal standard applied to discrimination claims brought under § 1981 and that therefore the mixed-motive defense to liability applied to claims brought under both Title VII and § 1981. Therefore, it is unreasonable, as the Eleventh Circuit has, to place any weight on the fact that Congress did not amend § 1981 in the Civil Rights Act of 1991 to eliminate a mixed-motive defense not known by Congress to exist.

The appellees can reason that since we held prior to *Price Waterhouse* that the same legal standard applied to discrimination claims brought under Title VII and § 1981, the establishment of a mixed-motive defense to liability under *Price Waterhouse* was automatically, without additional guidance from this Court, applicable to claims under § 1981. As a result, Congress's failure to amend § 1981 at the same time as it amended Title VII meant that the mixed-motive defense to liability continued to apply to causes of action brought under § 1981. Therefore, the appellees, following the logic of the Eleventh Circuit opinion in *Mabra*, contend that the plain language of § 1981 requires applicability of the mixed-motive defense to liability. The problem with this analysis is twofold.

---

[7]One difference between the pre-*Price Waterhouse* standard and the post-Civil Rights Act of 1991 standard was the change in evidentiary requirements for the mixed-motive defense to damages. Prior to *Price Waterhouse*, the Ninth Circuit required that a defendant prove by clear and convincing evidence that it would have made the same decision. *See Marotta*, 629 F.2d at 618. The Civil Rights Act of 1991 requires defendants to prove by a preponderance of the evidence that it would have made the same decision. *See Costa*, 539 U.S. at 97.

**[4]** First, there is nothing in the plain language of § 1981 establishing a mixed-motive defense to liability. In relevant part the statute simply states:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981. Any mixed-motive defense would have to be interpreted by the courts into the statute. Second, assuming the soundness of the logic that Price Waterhouse, without any additional guidance from this Court, was automatically extended to claims under § 1981, and that in order to eliminate the mixed motive defense to liability under § 1981, Congress was required to amend the statute, we must carry it a step further.

**[5]** Subsequent to the amendment of Title VII in the Civil Rights Act of 1991, we clearly determined, in accordance with the congressional amendment, that in a Title VII suit an employer could not avoid liability on the basis of the mixed-motive defense. *Costa*, 299 F.3d at 850 (9th Cir. 2002) *aff'd* 539 U.S. 90 (2003). In a later case, we re-confirmed the pre-*Price Waterhouse* determination that an "[a]nalysis of an employment discrimination claim under § 1981 follows the same legal principles as those applicable in a Title VII disparate treatment case." *Fonseca*, 374 F.3d at 850. As a result, at the very least our holding in *Fonseca* incorporated the amended Title VII into the § 1981 analysis such that the mixed-motive defense to liability is no longer available under § 1981. We therefore hold that the defendant cannot raise a mixed-motive defense to liability for discrimination claims

brought under § 1981. The mixed-motive defense, even if proven as an undisputed fact, does not provide a basis for summary judgment in a § 1981 discrimination case. *See Dominguez-Curry*, 424 F.3d at 1041-42.

[6] According to the same logic, we must find that a mixed-motive defense to liability is available for a retaliation claim brought under § 1981. In *Stegall v. Citadel Broadcasting Company*, we applied the mixed-motive defense to liability in a Title VII retaliation case. 350 F.3d 1061, 1062, 1068 (9th Cir. 2004). Since a claim under § 1981 follows the same legal principles as those applicable in a Title VII case, *see Fonseca*, 374 F.3d at 850, we hold that the mixed-motive defense to liability for retaliation found applicable in *Stegall*, also applies to this retaliation claim brought under § 1981. Therefore, if the mixed-motive defense to retaliation is proven as an undisputed fact, it can provide a basis for summary judgment.

## B. Section 1981 Claims

Metoyer's complaint alleged three § 1981 claims: (1) discrimination in the terms, conditions or privileges of employment based on SAG's failure to confirm her as National Director of Affirmative Action; (2) wrongful termination; and (3) retaliation. We affirm summary judgment on the claim of discrimination in the terms, conditions or privileges of employment, but reverse on the grant of summary judgment on Metoyer's wrongful termination and retaliation claims.

### 1. Discriminatory Breach of Contract

Metoyer's first § 1981 claim is that she was discriminated in the terms, conditions, or privileges of employment. In particular, she contends that SAG made oral representations that she was being hired for the position of National Director of Affirmative Action but she was never confirmed for the position and she remained in the lesser position of Executive

Administrator of Affirmative Action throughout her employment. In this position Metoyer received less pay.

**[7]** Section 1981 prohibits discrimination in the "benefits, privileges, terms, and conditions" of employment, *see* 42 U.S.C. § 1981(b); *see also Bains LLC v. Arco Products Co., Div. of Atlantic Richfield Co.*, 405 F.3d 764, 769 n.3 (9th Cir. 2005), and an employee's title and pay grade qualify as a privilege, term, or condition of employment. *See e.g. Hishon v. King & Spalding*, 467 U.S. 69, 75 (1984). In order to show discrimination, Metoyer must show that she was contractually entitled to the position of National Director of Affirmative Action such that her title and accompanying pay grade constituted one of the terms, conditions, or privileges of her employment. *See id.* (holding that the "terms, conditions, or privileges of employment" clearly included benefits that are part of an employment contract). Metoyer's claim fails because, due to the parol evidence doctrine, there is no *admissible* evidence establishing the Guild had a contractual obligation to confirm her as the National Director of Affirmative Action.

**[8]** Under California law, "[w]hether [an] agreement is [integrated] is a question of law for the judge." *Slivinsky v. Watkins-Johnson Co.*, 221 Cal. App. 3d 799, 805 (1990) (citation omitted). An express integration clause is not necessary to a determination that an agreement is integrated. *See Heller v. Pillsbury Madison & Sutro*, 50 Cal. App. 4th 1367, 1382 (1996) (citation omitted). Rather, "[t]he central question in determining whether there has been an integration, and thus whether the parol evidence doctrine applies, is whether the parties intended their writing to serve as the exclusive embodiment of their agreement." *Wagner v. Glendale Adventist Medical Center*, 216 Cal. App. 3d 1379, 1385-86 (1989) (citation and internal quotation marks omitted). Even "[w]hen only part of the agreement is integrated, the parol evidence rule applies to that part." *Slivinsky*, 221 Cal. App. 3d at 805 (citation, internal quotation marks and alterations omitted).

Although the court may consider evidence of surrounding circumstances, prior negotiations, and collateral agreements when determining integration, "[i]n the case of prior or contemporaneous representations, the collateral agreement must be one which might naturally be made as a separate contract, *i.e.*, if in fact agreed upon need not certainly have appeared in writing." *Wagner*, 216 Cal. App. 3d. at 1386 (citation omitted).

**[9]** Here, the Guild offered and Metoyer accepted employment as the Guild's Executive Administrator of Affirmative Action. Together, the Guild's offer letter and Metoyer's acceptance letter constitute an integrated employment contract. The Guild manifested its intent that the agreement be the final embodiment of their agreement by including all material terms: title, salary, benefits, and a starting date. In addition, the disclaimers contained in Guild's pre-printed employment application manifested a general intent on the part of the Guild that its employment contracts be integrated. Metoyer acknowledged the Guild's intent, either before or shortly after she accepted the Guild's offer of employment, by signing an application, stating:

> I understand that *nothing contained in this application or conveyed during my interview* which may be granted by the Guild is intended to create an employment contract between me and the Guild.
>
> *       *       *
>
> I understand that no representative of the Guild has any authority to enter into any agreement for employment for any specified period of time, or to make commitments or promises or assure any benefits or other terms and conditions of employment *unless such agreements, promises, commitments or assurances are made in writing and signed by the Executive Director of Screen Actors Guild.*

(emphasis added).

Moreover, Metoyer manifested her intent that the Guild's offer letter and her acceptance letter be the final embodiment of their agreement by explicitly accepting on the basis of the terms contained in the Guild's letter: "This letter is written to confirm my acceptance of the position of Executive Administrator, Affirmative, *with all the terms and conditions as stated in your letter dated April 27, 1998*." (emphasis added).

**[10]** Notwithstanding the fact that neither the Guild's offer letter nor her acceptance letter mentions future confirmation as the National Director of Affirmative Action, Metoyer alleges discrimination in the "terms, conditions, or privileges of employment" under § 1981 because of SAG's failure to confirm her as the National Director of Affirmative Action. In support of this claim, Metoyer offers oral representations made by Nirschl and Barbadian during her interview process. Specifically, she offers Nirschl's statement that the Guild would be changing the Executive Administrator of Affirmative Action position into a National Director of Affirmative Action position within a few months. Under the parol evidence doctrine, Nirchl's prior oral representations, which would not naturally have been made as a separate contract, are inadmissible "to vary or contradict the terms of an integrated written instrument." *Wagner*, 216 Cal. App. 3d at 1385 (citations omitted). In addition, Metoyer acknowledges the qualified nature of similar representations by Barbadian:

> Q.   What did he say about it?
>
> A.   He said that the department was in disarray and basically, because of the requirements of the job, the title should be — should be director, as with my other position. He basically said that — the same thing Ms. Nirschl said, but that the executive — this executive administrator position would be changed, *probably*.

Q.   Did he give you any time line where it would be changed?

A.   No.

Q.   Did he promise you "Absolutely, I promise you it will be changed"?

A.   *No*, because he said he might be leaving.

Even if the title of Metoyer's position were not part of an integrated employment contract, "[t]here cannot be a valid express contract and an implied contract, each embracing the same subject, but requiring different results" because the "express term is controlling even if it is not contained in an integrated employment contract." *Halvorsen v. Aramark Uniform Services, Inc.*, 65 Cal. App. 4th 1383, 1388 (1998) (citations omitted).

Alternatively, Metoyer can prove discrimination in privileges of employment on the basis of discriminatory denial of benefits that were not included in her contract. *See Hishon*, 467 U.S. at 75 ("An employer may provide its employees with many benefits that it is under no obligation to furnish by any express or implied contract."). But this benefit must be "part and parcel of the employment relationship." *Id.* For example in *Hishon*, the Supreme Court held that "the opportunity to become a partner [in a law firm] was part and parcel of an associate's status as an employee [at the law firm]." *Id.* at 76. Metoyer's claim fails on this account as well. There is no evidence that confirmation as National Director of Affirmative Action was part and parcel of her position as Executive Administrator of Affirmative Action. In fact, the evidence points to the contrary. At the time of Metoyer's hiring, no position of National Director of Affirmative Action existed within SAG and as a result, the other Executive Administrator of Affirmative Action in New York City and prior Executive Administrators of Affirmative Action had not regularly been

elevated to such a position in a manner comparable to the elevation of associates to partners in law firms.

[11] Accordingly, we hold the district court did not err in granting the Guild summary judgment as to Metoyer's "failure to confirm" claim because there is no triable issue of fact regarding the terms of Metoyer's employment contract or the privileges of her employment. Specifically, there is no admissible evidence supporting Metoyer's claim the Guild was contractually obligated to confirm her as National Director of Affirmative Action or that it was a privilege of her employment.

2.    *Wrongful Termination*

Metoyer's second contention is that the district court erred in granting summary judgment as to her claims of discriminatory termination under § 1981. The district court applied the *McDonnell Douglas* burden shifting framework and determined that the plaintiff "failed to present 'specific' and 'substantial' circumstantial evidence of pretext sufficient to raise a genuine issue of material fact" with respect to SAG's decision to terminate her.

Metoyer contends that the district court erred in granting summary judgment because she presented both direct and circumstantial evidence demonstrating that SAG management harbored discriminatory animus toward African-Americans. We agree.

[12] Metoyer presented direct evidence of discrimination in the form of several remarks by members of senior management suggesting the existence of racial bias. We have held that bigoted remarks by a member of senior management may tend to show discrimination, even if directed at someone other than the plaintiff. *Cordova v. State Farm Ins. Cos.*, 124 F.3d 1145, 1149 (9th Cir. 1997). Furthermore, we have held that remarks by such a decisionmaker tend to show bias, even if

several years old. *See Mustafa v. Clark County School Dist.*, 157 F.3d 1169, 1179-80 (9th Cir. 1998).

Beginning in August of 1999, when Metoyer petitioned the Guild's Senior Staff to create a National Director of Affirmative Action position, Linda Schick, explained, "[t]here are no people of color on senior staff, and it's very unlikely that there will be." As part of her job, Metoyer related complaints of racial discrimination by minority employees within the Guild. Shick responded to Metoyer's relayed complaints that African-Americans were being kept in low-paying jobs by stating, "I'm keeping them there because I want to keep an eye on them because black people like to party and eat and don't do their work." Chassman responded, "[t]hey ought to be glad they have a job." In another meeting, Chassman made a discriminatory remark to Metoyer in response to more complaints of discrimination by minority employers: "All of these people are lazy and malingerers. Is that something special with African-Americans that they have to socialize all the time and they are never happy? They should be happy to have this job." Schick warned Metoyer that SAG senior management did not tolerate people of color talking back the way she did, commenting that "you talk more than other black people here. The rest of them are like — they're like a tribe or something. They hang around together, and they don't talk. You're unusual. You talk too much."

[13] Metoyer has also presented circumstantial evidence of discriminatory animus held by SAG senior management towards African-Americans. The numerous complaints of discrimination by minority employees of SAG, in particular the complaints to Metoyer that the Guild's senior staff, including Schick, Chassman and McGuire were discriminating on the basis of race in making promotions and assigning work and pay is circumstantial evidence demonstrating discriminatory animus.

The Guild contends that McGuire was the sole decision-maker in terminating Metoyer. Therefore, the discriminatory statements by Shick and Chassman are irrelevant because they had no role in the termination decision. The Guild argues that since there is no direct evidence of discriminatory animus by McGuire, summary judgment was appropriate. The Guild is correct in its contention that there is no evidence linking Schick to the termination decision, but there is evidence that raises a genuine issue of material fact as to the role of Chassman in the firing decision. Chassman was Metoyer's direct supervisor at SAG and was, therefore, responsible for decisions regarding her employment. In particular, he had the authority to terminate her employment. McGuire consulted with Chassman on the decision to suspend Metoyer. The letter informing Metoyer of that decision was signed and delivered by Chassman. Just prior to being placed on administrative leave, Metoyer was summoned to McGuire's office regarding "a personnel matter"; when she arrived Chassman was present.[8]

Even if Chassman is not considered the ultimate decision-maker, "[w]here . . . the person who exhibited discriminatory animus influenced or participated in the decisionmaking process, a reasonable factfinder could conclude that the animus affected the employment decision." *Dominguez-Curry*, 424 F.3d at 1039-40 (citation omitted). Metoyer has presented ample evidence from which a trier of fact could conclude that Chassman influenced or participated in the decisionmaking process. Combining the evidence raising a triable issue of fact regarding Chassman's role or influence in the decisionmaking process with the evidence of his discriminatory remarks, Metoyer has presented direct evidence sufficient to survive summary judgment of discriminatory animus by a decision-maker.

---

[8]There is also evidence in the form of a letter from SAG's president to Chassman and McGuire regarding disciplinary actions against "members" of the department that Chassman and McGuire were generally working together with respect to all dismissals in the Affirmative Action department.

There is evidence that the Guild was not motivated by discrimination in terminating Metoyer. In particular, the Guild contends that Metoyer was terminated because of the PwC audit, which showed that Metoyer had misappropriated more than $30,000 in IACF grant funds. However, there is also evidence in the record to the contrary. Specifically, McGuire, who had previously demonstrated racial animus toward Metoyer, testified in his deposition that the PwC audit "was to be of the three [Metoyer] grants that we've been talking about." When asked why the audit was limited to just these grants, McGuire responded, "The reason was because of the concerns raised specifically that that's where the audit should be concentrated." This conflicting evidence raises a material issue of fact precluding summary judgment.

[14] In light of the substantial direct and circumstantial evidence of discriminatory animus by SAG management, which made the decision to audit Metoyer, we conclude that Metoyer has raised a genuine issue of fact as to whether SAG was more likely than not motivated by discrimination in its decision to terminate her. *See id.* at 1042 ("[T]he plaintiff in any Title VII case may establish a violation through a preponderance of the evidence . . . that a protected characteristic played 'a motivating factor. To overcome summary judgment, a plaintiff merely must raise a triable issue as to this question." (citation omitted)). Therefore, we conclude that the district court erred in its grant of summary judgment on the § 1981 claim of discriminatory termination.

### 3. *Retaliation*

[15] Metoyer presented both direct and circumstantial evidence of retaliation for bringing discrimination complaints to the attention of SAG management and for highlighting the fraudulent Equal Employment Opportunity (EEO-1) report submitted to the Equal Employment Opportunity Commission (EEOC). In spite of her position as Executive Administrator of Affirmative Action, Metoyer was told that it was not her

business to raise complaints of racial discrimination and that she was not to take her concerns to anyone other than Schick and Chassman. When appellant failed to heed the warnings that her opposition to discrimination was unwelcome, senior staff responded to the relayed complaints with discriminatory comments about African-Americans by both Schick and Chassman. *See supra* III.B.2. Chassman accused Metoyer of encouraging SAG employees to come forward with complaints of racial discrimination and became angry that Metoyer was sowing discontent by raising allegations of discrimination. Finally, when the appellant raised the fraudulent EEO-1 report to SAG Senior management and announced her intention to discuss the discrepancies and present the discrimination complaints by employees to SAG's national plenary session in April 2001, Schick responded vindictively, "That bitch, I'm going to get that bitch." Shortly before the plenary session, Metoyer was suspended by SAG senior management ostensibly because of the findings from the PwC audit. As a result of the suspension, Metoyer was not allowed to address the plenary session.

The direct evidence of retaliatory intent by Chassman, a participant in the suspension and termination decision, for Metoyer's engagement in protected activity, and the timing of the suspension, which ultimately resulted in Metoyer's termination, raises a triable issue of fact as to the § 1981 retaliation claim.

The Guild asserts a "mixed-motive" defense under which an employer can avoid liability for retaliation by showing that it would have made the same decision absent any impermissible motivation. *See Stegall*, 350 F.3d at 1068; *Price Waterhouse*, 490 U.S. at 242. "As to the employer's proof, in most cases, the employer should be able to present some objective evidence as to its probable decision in the absence of an impermissible motive." *Id.* at 252. "The mixed-motive inquiry is an intensely factual one." *Gilbrook v. City of Westminster*, 177 F.3d 839, 855 (9th Cir. 1999). Further, since the defen-

dant bears the burden of proof on the mixed-motive defense, "the defendant[ ] must vault a very high hurdle" to obtain judgment as a matter of law. *Settlegoode v. Portland Public Schools*, 371 F.3d 503, 512 (9th Cir. 2004). Accordingly, mixed-motive defenses are generally for the jury to decide.

**[16]** We hold that SAG has not presented sufficient evidence to support summary judgment based on the mixed-motive defense. The Guild contends that its mixed-motive defense is supported by an investigation conducted by a third-party accounting firm that concluded Metoyer made questionable payments to Bae and Nguyen, two current Guild employees; Bolding, a recent Guild employee; and Metoyer's husband's production company. While the facts of the misconduct are undisputed, SAG's contention that it would have made the same decision is undermined by Metoyer's declaration that other persons engaged in questionable practices related to IACF funds and faced no disciplinary consequences.

**[17]** In addition to the McGuire testimony, there was also evidence in the record that the PwC audit was not a completely unbiased investigation. Ron Thompson, C.P.A., evaluated the methodology utilized by PwC, and concluded that there were questions concerning whether the investigation truly encompassed all outstanding grants. Thompson based his conclusion on a statement in the PwC report that PwC was retained "to evaluate *certain* grant activities based upon allegations of potential misconduct by *one* of the grant administrators[,]" specifically those grants administered by Dr. Metoyer. Thompson also suggested that the other grants were only mentioned in the report to prevent the appearance that Dr. Metoyer's grants were the target of the investigation. Thompson's opinion was supported by a statement from Daniel Smith-Christopher, a professor at Loyola Marymount University, that during his interview with PwC, the focus was on Dr. Metoyer. This evidence raised a material question of fact regarding whether discriminatory animus prompted and influ-

enced the PwC investigation, rendering summary judgment inappropriate. We therefore reverse summary judgment on the § 1981 retaliation claim.

### 4.   State Law Discrimination and Retaliation Claims

Metoyer has also presented claims of discrimination and retaliation under the California Fair Employment and Housing Act. The appellees contend that she consented to the dismissal of these state law claims. We hold that Metoyer has not consented to the dismissal of her state law claims and that judgment on the pleadings is reversed on both claims.

This case was first filed in California state court. Metoyer originally pleaded only state-law discrimination claims. After the state trial judge granted the Defendant's motion for summary judgment on the basis that, under the Supremacy Clause of the United States Constitution, U.S. Const. Art. VI, cl. 2,[9] the Labor-Management Reporting and Disclosure Act of 1959 ("LMRDA") preempted Metoyer's FEHA claims, Metoyer added her § 1981 claims and the defendants removed the case to federal court. Defendants moved for summary judgment, contending once again that the LMRDA preempts FEHA, thereby barring Metoyer's FEHA based claims. During argument on this motion, the court explained its view that the case would be won or lost on the § 1981 claims and asked Metoyer's counsel, "[W]hy not just dismiss the [FEHA] claim?"

---

[9]Article VI, clause 2, of the United States Constitution states:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. Const. Art. VI, cl. 2.

At the court's request, the parties then filed supplemental briefs on preemption and on whether the state trial judge's ruling was binding. In her supplemental brief, Metoyer argued against preemption. She stated, however, that:

> In response to the court's question during oral argument as to why Plaintiff still needs the state law claims *along with the federal claims*, Dr. Heisser Metoyer is prepared to dismiss her state FEHA claims and proceed to trial on the 42 U.S.C. section 1981 causes of action.

(Emphasis added.)[10] Based on this statement, the district court held that Metoyer consented to dismissal of her FEHA claims.

We have previously upheld an "unqualified oral stipulation of dismissal made in open court" as effective to consent to judgment on claims. *See Eitel v. McCool*, 782 F.2d 1470, 1473 (9th Cir. 1986). However, for the dismissal to be effective, it must unqualified and unambiguous. Here, Metoyer's statement in her brief is too ambiguous to constitute such consent. The statement "is prepared to dismiss" may mean something other than she is dismissing. It may reasonably mean she is awaiting some consideration for such dismissal; it may equally mean a preliminary, not final, decision.

Although Metoyer's FEHA and § 1981 claims are largely parallel, the Guild asserted that 29 U.S.C. § 504 ("§ 504") barred Metoyer's § 1981 claims, an assertion that does not necessarily bar Metoyer's FEHA claims. Therefore, one reasonable interpretation of Metoyer's statement was that she was prepared to dismiss the FEHA claims, if the court determined that § 504 did not bar her federal claims from proceeding to trial. Further, Metoyer requested that the court deny judgment in its entirety and argued extensively against pre-

---

[10]As part of this same motion, Metoyer requested the court to deny the Guild's motion for summary judgment in its entirety.

emption of her FEHA claims in the same brief. Thus, the district court erred in interpreting Metoyer's statement as stipulating to dismissal of her FEHA claims.

[18] California courts apply the Title VII framework to claims brought under FEHA. *See Guz v. Bechtel Nat. Inc.*, 24 Cal. 4th 317, 354 (2000) ("Because of the similarity between state and federal employment discrimination laws, California courts look to pertinent federal precedent when applying our own statutes."). We therefore reverse the district court's grant of summary judgment on the state law discrimination and retaliation claims for the same reasons we reverse on the federal law discrimination and retaliation claims.

## IV.   CONCLUSION

For the foregoing reasons, we **AFFIRM** summary judgment on Metoyer's § 1981 claim of discriminatory failure to confirm as National Director of Affirmative Action. We **REVERSE** summary judgment on the federal and state discrimination and retaliation claims because Metoyer has raised a triable issue of fact as to all of these claims.

**AFFIRMED IN PART; REVERSED IN PART. Each party is to bear its costs on appeal.**

---

BEA, Circuit Judge, concurring in part and dissenting in part:

Metoyer sued the Screen Actors Guild ("the Guild")[1] for race discrimination and retaliation after the Guild fired her.[2]

---

[1] Also named as Defendants were John McGuire, the Guild's Acting Executive National Director, and Leonard Chassman, the Guild's Hollywood Executive Director. For the sake of clarity, I will refer to all Defendants collectively as "the Guild."

[2] Metoyer did not bring a Title VII action for discrimination in employment. She did not file a claim with the Equal Employment Opportunity Commission ("EEOC"). She sued only under 42 U.S.C. § 1981, which provides a more generous avenue of relief than Title VII. *See infra* note 11.

She was fired. But only after she admitted to the Guild she had doled out over $30,000 of Guild funds to her business partners, friends, and family through a pretty simple, but effective, scheme. She admitted she fabricated bogus invoices and concocted inexistent events. She authorized Guild payments for these phoney items to the nice-sounding Loyola Marymount University ("LMU"). There, a compliant LMU employee would hold the Guild money till Metoyer gave instructions for disbursement to her business partners, friends, and family.

LMU was a cut-out. The paper trail at the Guild would show that only LMU had received the funds in payment for invoices or for events. LMU's records would show who the real recipients were, but those records were not on the Guild's premises.

In a misguided opinion, the majority rejects the Guild's defense that notwithstanding the validity of Metoyer's racial discrimination claims, the Guild had a perfect right to fire her, and would have done so, because of Metoyer's theft of its funds. That is, the majority rejects the "mixed-motive defense" in a § 1981 discrimination action.

In reversing summary judgment for the Guild, the majority got the law and the facts wrong.

*The Law*. The Civil Rights Act of 1991 ("1991 CRA")[3] amended Title VII to make the mixed-motive defense only a defense to damages, but not to liability, in discrimination actions brought under "section 2000e-2(m) of this title." 42 U.S.C. § 2000e-5(g)(2)(B). The majority holds § 2000e-5(g)(2)(B) somehow applies to actions brought under § 1981. This, in spite of the fact that § 1981 was also amended as to other particulars with the 1991 CRA, but no limitation to the mixed-motive defense was enacted in § 1981.

---

[3]Pub. L. No. 102-166, 105 Stat. 1071 (effective Nov. 21, 1991).

In effect, the majority opinion amends § 2000e-5(g)(2)(B) to make its limitations on the mixed-motive defense applicable to actions brought "under section 2000e-2(m) *or section 1981* of this title." This violates the fundamental provision of the United States Constitution that vests legislative power in the Congress of the United States.[4]

The majority opinion's amendment of § 2000e-5(g)(2)(B) also creates an inter-circuit split with the Eleventh Circuit. *Mabra v. United Food & Commercial Workers Local Union No. 1996,* 176 F.3d 1357, 1357-58 (11th Cir. 1999). Such amendatory reading of § 2000e-5(g)(2)(B) also departs from the wise reasoning of other sister circuits that have held § 2000e-5(g)(2)(B), by its plain language, is inapplicable to actions brought under the Age Discrimination in Employment Act, the False Claims Act, and 42 U.S.C. § 1983.[5]

*The Facts*. One cannot get away from the fact that Metoyer gave the Guild the motive for her firing by *admitting* fabrication of invoices, payment of Guild funds in direct violation of undisputed Guild policies, and total lack of documentation for any services rendered in supposed exchange for the Guild funds defalcated by her. There simply is no triable issue that she pilfered the Guild's funds. Henceforth, at least in the Ninth Circuit, employers will be forced to go to trial for terminating a thieving employee, so long as the employee makes a colorable claim that a potentially discriminatory motive played a role in the employer's action.

---

[4]U.S. Const., art. I., sec.1.

[5]Inexplicably, the majority opinion does not apply the limitations on the mixed-motive defense to *retaliation* actions brought under § 2000e-3 of Title VII, upon the common sense ground that the limitations apply only to "actions brought under section 2000e-2(m) of this title." § 2000e-5(g)(2)(B). It is difficult to fathom why the limitation does *not* apply to a statute just a subsection away because it is not named in the limitation, but *does* apply to a statute in another section of the United States Code, similarly not named. *See infra* Part I.C.

Unlike the majority, I think that an amendment to one statute cannot *sub silentio* rewrite another. Unlike the majority, I think there is no triable issue that the Guild would have fired Metoyer for theft and fraud even in the absence of a discriminatory motive. I concur in Part III.B.1 of the majority opinion affirming the district court's grant of summary judgment for the Guild on Metoyer's discriminatory breach of contract claim. From the rest of the majority opinion reversing the district court's grant of summary judgment, I respectfully dissent.

## I.

The crux of this case then, is: (1) whether the mixed-motive defense remains a complete defense to § 1981 actions after the enactment of the 1991 CRA; and (2) if so, whether a triable issue of fact exists as to the Guild's decision to terminate Metoyer for wrongfully giving over $30,000 of Guild funds to friends, family, and business partners, and falsifying invoices to cover up her tracks.

## A.

The Supreme Court first recognized the mixed-motive defense to Title VII discrimination actions in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989). Hopkins sued Price Waterhouse under Title VII, claiming Price Waterhouse discriminated against her on the basis of gender in not proposing her for partnership after her candidacy was put on hold. *Id.* at 231-32. The district court found that Price Waterhouse's decision was based partly on impermissible gender stereotyping and partly on the legitimate reason that Hopkins had an abrasive interpersonal style. *Id.* at 236-37. The Supreme Court held an employer's mixed motive in making an employment decision can be a complete defense to liability: "[O]nce a plaintiff in a Title VII case shows that gender played a motivating part in an employment decision, the defendant may avoid a finding of liability only by proving that it would have

made the same decision even if it had not allowed gender to play such a role." *Id.* at 244-45 (footnote omitted). This defense became known as the "mixed-motive defense." Under *Price Waterhouse*, the mixed-motive defense was a complete bar to Title VII liability if the defendant proved, by a preponderance of the evidence, that it would have made the same employment decision absent the discriminatory motive. *Id.* at 252-53.

At the time of the *Price Waterhouse* decision, every circuit to address the question, including the Ninth, had applied the same standards for liability to Title VII and § 1981. "Title VII and section 1981 are overlapping but independent remedies for racial discrimination in employment. . . . The same standards are used to prove both claims . . . and facts sufficient to give rise to one are sufficient to give rise to the other." *Lowe v. City of Monrovia*, 775 F.2d 998, 1010 (9th Cir. 1985) (citations omitted).[6] Thus, with the Supreme Court's decision in *Price Waterhouse*, the mixed-motive defense also became an affirmative defense to actions brought under § 1981. *See Odima v. Westin Tucson Hotel Co.*, 991 F.2d 595, 601-02 (9th Cir. 1993) (reversing both Title VII and § 1981 judgments for the plaintiff based on the district court's failure, *inter alia*, to consider the mixed-motive defense); *Bains LLC v. Arco Products Co.*, 405 F.3d 764, 772 (9th Cir. 2005) (rejecting the defendant's mixed-motive defense to a § 1981 claim for lack of evidence).[7] Indeed, even the majority concedes that

───────────────

[6] *See also Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184 (2nd Cir. 1987) (applying the *McDonnell Douglas* framework from Title VII case law to analyze a § 1981 action); *Lewis v. Univ. of Pittsburgh*, 725 F.2d 910, 915 n.5 (3rd Cir. 1983) (holding § 1981 and Title VII actions require the same elements of proof and collecting authority from the Second, Fourth, Fifth, and Eighth Circuits).

[7] *See also Pulliam v. Tallapoosa County Jail*, 185 F.3d 1182, 1184 (11th Cir. 1999) (holding the mixed-motive defense is an affirmative defense to liability in § 1981 actions); *Thomas v. Denny's, Inc.*, 111 F.3d 1506, 1511-12 (10th Cir. 1997) (holding it was error for the district court to reject a

because the same standards are used to prove both Title VII and § 1981 claims, the mixed-motive defense became a defense to § 1981 actions before the 1991 CRA's enactment.[8]

mixed-motive instruction in a § 1981 case); *Hargett v. Nat'l Westminster Bank, USA*, 78 F.3d 836, 840-41 (2nd Cir. 1996) (holding a *Price Waterhouse* mixed-motive instruction is proper in a § 1981 action if "there is evidence to show that an employment determination was the product of a mixture of legitimate and illegitimate motives" (quotation marks and citations omitted)); *Williams v. Fermenta Animal Health Co.*, 984 F.2d 261, 264-65 (8th Cir. 1993) (holding the district court gave a proper mixed-motive instruction for plaintiff's claims under § 1981 and Title VII); *New Burnham Prairie Homes, Inc. v. Vill. of Burnham*, 910 F.2d 1474, 1483 (7th Cir. 1990) (holding a mixed-motive instruction is proper in a claim brought under §§ 1981 and 1982).

[8]The majority asserts, however, that at the time of the 1991 CRA's enactment, the mixed-motive defense to § 1981 was a defense only to *damages*, but not to *liability*. To support this assertion, the majority relies on a number of Ninth Circuit opinions that predate the Supreme Court's decision in *Price Waterhouse* and that apply the mixed-motive defense only to damages, but not to liability, in Title VII actions.

Nevertheless, *Price Waterhouse*, which was decided before the 1991 CRA's enactment, changed the legal landscape for the mixed-motive defense. After *Price Waterhouse*, the mixed-motive defense became a complete bar to liability, not merely a defense to damages. *Price Waterhouse*, 490 U.S. at 244-45 ("[O]nce a plaintiff in a Title VII case shows that gender played a motivating part in an employment decision, the defendant *may avoid a finding of liability* . . . by proving that it would have made the same decision even if it had not allowed gender to play such a role." (emphasis added) (footnote omitted)).

The fact that *Price Waterhouse* was a Title VII decision is of no material consequence. At the time of the *Price Waterhouse* decision, we were defining the liability standards under § 1981 by reference to Title VII case law. *See Lowe*, 775 F.2d at 1010. As a corollary, and as the majority concedes, Title VII case law on the mixed-motive defense also controlled the mixed-motive defense under § 1981. Thus, when Title VII case law on the mixed-motive defense was altered by *Price Waterhouse*, so was the mixed-motive defense under § 1981. Consequently, the mixed-motive defense became a complete bar to liability in § 1981 actions as well. *See supra* note 7 and accompanying text (citing authorities from the Ninth Circuit as well as from the Second, Seventh, Eighth, Tenth, and Eleventh Circuits).

The question then is what effect, if any, the 1991 CRA had on the applicability of the mixed-motive defense as a complete bar to liability under § 1981.

## B.

I begin my interpretation, as I must, with the text of the 1991 CRA. And "where, as here, the words of the statute are unambiguous, the judicial inquiry is complete." *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 98 (2003) (citations and quotation marks omitted). At issue in this case are two new provisions the 1991 CRA added to Title VII, but not to § 1981. The first provision establishes the "mixed-motive" ground for Title VII liability. *Id.* at 94. It states:

> Except as otherwise provided in this subchapter, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice.

42 U.S.C. § 2000e-2(m). The second provision allows a defendant to limit the plaintiff's remedies, but not completely avoid liability, in an action brought under § 2000e-2(m) if the defendant can prove a mixed-motive defense:

> On a claim in which *an individual proves a violation under section 2000e-2(m) of this title* and a respondent demonstrates that the respondent would have taken the same action in the absence of the impermissible motivating factor, the court—
>
> (i) may grant declaratory relief, injunctive relief (except as provided in clause (ii)), and attorney's fees and costs demonstrated to be directly attributable only to the pursuit of a claim under section 2000e-2(m) of this title; and

(ii) shall not award damages or issue an order requiring any admission, reinstatement, hiring, promotion, or payment, described in subparagraph (A).

42 U.S.C. § 2000e-5(g)(2)(B) (emphasis added). Thus, § 2000e-5(g)(2)(B) modified *Price Waterhouse* insofar as the *Price Waterhouse* Court recognized the mixed-motive defense as a complete bar to liability. *See Estate of Reynolds v. Martin*, 985 F.2d 470, 475 n.2 (9th Cir. 1993). Under the new § 2000e-5(g)(2)(B), the mixed-motive defense is a defense only to damages for an action under § 2000e-2(m), but not to liability for prospective equitable relief and attorneys' fees.

Metoyer's case requires us to decide what effect § 2000e-5(g)(2)(B) has on an action brought under § 1981. The answer: Absolutely none. Congress could not have been more explicit. Section 2000e-5(g)(2)(B) applies only "[o]n a claim in which an individual proves a violation under section 2000e-2(m) of this title." Section 2000e-5(g)(2)(B) does *not* state that it applies "[o]n a claim in which an individual proves a violation under section 2000e-2(m) *or section 1981 of this title*." Yet the majority, after a convoluted legal analysis, amends § 2000e-5(g)(2)(B) to say just that.

The majority's judicial amendment is even more difficult to understand under any known precept of statutory interpretation because Congress also amended § 1981 in the 1991 CRA. *See* Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071, 1071-72 (1991).[9] Absent from the 1991 CRA's amend-

---

[9]Section 101 of the 1991 CRA states:

Section 1977 of the Revised Statutes (42 U.S.C. 1981) is amended—

(1) by inserting "(a)" before "All persons within"; and

(2) by adding at the end the following new subsections:

"(b) For purposes of this section, the term 'make and enforce contracts' includes the making, performance, modification, and

ments to § 1981, however, is any limitation on the applicability of the mixed-motive defense to § 1981. It is well-established that if "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (quotation marks and citations omitted). Where Congress intended to limit the mixed-motive defense, it did so expressly and only as to certain claims (damages) but not others (prospective equitable relief and attorneys' fees). *See* § 2000e-5(g)(2)(B). This is compelling evidence that Congress's omission of such a limitation in § 1981, which Congress also amended in the very same Act, was intentional and not accidental.

It is also a "cardinal principle of statutory construction" that we must "give effect, if possible, to every clause and word of a statute." *Duncan v. Walker*, 533 U.S. 167, 174 (2001) (quotation marks and citations omitted). We must be "reluctan[t] to treat statutory terms as surplusage." *Id.* (quotation marks and citations omitted). In remarkable disregard of this fundamental principle, the majority's application of § 2000e-5(g)(2)(B) to § 1981 renders the following words in § 2000e-5(g)(2)(B) entirely superfluous: "On a claim in which an individual proves a violation under section 2000e-2(m) of this title . . ."[10] If this provision also applies to § 1981, it is

---

termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

"(c) The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law."

*Id.* at 1071-72.

[10]The majority's interpretation of § 2000e-5(g)(2)(B) also renders another part of that provision superfluous. Section 2000e-5(g)(2)(B)(i) states that when the defendant successfully asserts a mixed-motive

superfluous because its language limits the provision to claims for the violation of § 2000e-2(m). The only interpretation that would not render any part of § 2000e-5(g)(2)(B) superfluous is the one that makes that provision applicable only to actions brought under § 2000e-2(m).

Under its clear statutory language, § 2000e-5(g)(2)(B) has no applicability to § 1981 actions. *See Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 835 (1990) ("Absent a clearly expressed legislative intention to the contrary, [the statutory] language must ordinarily be regarded as conclusive."); *cf. Johnson v. Ry. Exp. Agency, Inc.*, 421 U.S. 454, 460-61 (1975) (holding Title VII's administrative complaint requirements apply only to Title VII actions and do not apply to § 1981 claims). Rarely does Congress declare its intent with such specificity. Instead of embracing that intent, the majority rejects it, without stating what in the world § 2000e-5(g)(2)(B) would mean if it does not limit the mixed-motive defense only as to § 2000e-2(m) claims.[11]

---

defense, the court may not award damages, but may award, *inter alia*, "attorney's fees and costs demonstrated to be directly attributable *only to the pursuit of a claim under section 2000e-2(m)* of this title." *Id.* (emphasis added). While the majority does not expressly address whether attorney's fees will be available to a plaintiff in a § 1981 action when the defendant proves the mixed-motive defense, this conclusion is implicit in its holding that § 2000e-5(g)(2)(B) is "incorporated" into § 1981. As a result, the majority also renders superfluous the portion of § 2000e-5(g)(2)(B)(i) that allows the recovery of attorney's fees attributable "only to the pursuit of a claim under section 2000e-2(m) of this title."

[11]I am loath to speculate as to Congress's reasons for limiting the mixed-motive defense in Title VII discrimination actions, but not in § 1981 actions. Nevertheless, for those who look beyond the statutory text for congressional intent, I note that § 1981 provides a much more attractive avenue of relief to plaintiffs than does Title VII. First, Title VII applies only to employers with fifteen or more employees, whereas § 1981 has no such threshold requirement. 42 U.S.C. § 2000e(b). Second, Title VII requires the plaintiff to exhaust administrative remedies, such as filing a claim with the EEOC (a step that Metoyer did not take), before seeking

The majority reasons that because our decision in *Fonseca* held "the same legal principles" apply to § 1981 and Title VII actions, *Fonseca*'s holding "incorporated the amended Title VII into the § 1981 analysis such that the mixed motive defense to liability is no longer available under § 1981." The majority's reliance on *Fonseca* is entirely misplaced. *Fonseca* had nothing to do with the mixed-motive defense or with the 1991 CRA's amendments to Title VII.[12] In *Fonseca*, we merely reaffirmed what we had been holding for two decades: the *McDonnell Douglas* burden-shifting framework from Title VII case law can also be used to analyze § 1981 actions. *Fonseca v. Sysco Food Servs. of Ariz.*, 374 F.3d 840, 847-50 (9th Cir. 2004) (citing *Lowe v. City of Monrovia*, 775 F.2d 998 (9th Cir. 1985)). The majority takes out of context *Fonseca*'s holding as to the *McDonnell Douglas* framework and extends it to a provision, § 2000e-5(g)(2)(B), which the *Fonseca* court did not even cite. The majority's quite original, but quite erroneous, interpretation of § 2000e-5(g)(2)(B) is bad enough. But the majority compounds this error by stretching the language quoted from *Fonseca* outside the context in which the words were used.

## C.

In addition to circumventing the plain language of § 2000e-5(g)(2)(B), the majority's holding conflicts with the decisions

---

a private action for damages, whereas § 1981 has no such requirement. 42 U.S.C. § 2000e-5(f). Third, there are limits on compensatory and punitive damages recoverable under Title VII, whereas no such limits exist for damages under § 1981. 42 U.S.C. § 1981a(b)(3). Finally, Title VII covers only employment discrimination, but § 1981 is not so limited. Because § 1981 provides a more generous avenue for relief, Congress may have wanted to retain the mixed-motive defense as a complete bar to liability under § 1981, while limiting its applicability only to the more limited damages recoverable under Title VII.

[12]Indeed, the word "motive," let alone "mixed motive," does not even appear in the *Fonseca* opinion.

of many of our sister circuits. First, the majority creates a direct circuit split with the Eleventh Circuit, which correctly interpreted § 2000e-5(g)(2)(B) to be inapplicable to § 1981. *Mabra v. United Food & Commercial Workers Local Union No. 1996*, 176 F.3d 1357, 1357-58 (11th Cir. 1999). The *Mabra* court reasoned that the plain language of § 2000e-5(g)(2)(B) makes no reference to § 1981. *Id.* The court found this omission to be particularly telling where the 1991 CRA also amended § 1981 to add two new subsections, none of which limit the applicability of the mixed-motive defense to § 1981 actions. *Id.*[13]

Second, at least seven of our sister circuits have concluded that § 2000e-5(g)(2)(B), which by its express language applies only to Title VII *discrimination* claims under § 2000e-2(m), is inapplicable even to Title VII *retaliation* claims under § 2000e-3. *See Matima v. Celli*, 228 F.3d 68, 81 (2nd Cir. 2000) (so holding and collecting cases from the First, Third, Fourth, Seventh, Eighth, and Eleventh Circuits). These courts hold § 2000e-5(g)(2)(B)'s plain language compels this conclusion even though, like in § 1981 actions, courts have "generally borrowed from [Title VII] discrimination law in determining the burdens and order of proof in [Title VII] retaliation cases." *Woodson v. Scott Paper Co.*, 109 F.3d 913, 934 (3rd Cir. 1997). Indeed, even the majority opinion holds § 2000e-5(g)(2)(B) is inapplicable to Title VII retaliation actions, and by extension, to § 1981 retaliation actions.

In so holding, the majority relies on our decision in *Stegall v. Citadel Broadcasting Co.*, 350 F.3d 1061 (9th Cir. 2004). In *Stegall*, which was decided after the 1991 CRA's enact-

---

[13]The majority rejects *Marba* as relying on "the faulty premise" that the mixed-motive defense was a complete defense to liability under § 1981 before the 1991 CRA's enactment. For the reasons outlined *supra* note 8, the majority is incorrect. With the Supreme Court's decision in *Price Waterhouse* and before the 1991 CRA's enactment, the mixed-motive defense became a complete defense to liability under § 1981 actions as well.

ment, we assumed the mixed-motive defense continues to be a complete bar to liability in a Title VII retaliation action under § 2000e-3. *Id.* at 1068. The *Stegall* court did not explain why the 1991 CRA did not alter the mixed-motive analysis in a Title VII retaliation action, perhaps because that explanation is very straightforward. As discussed above, § 2000e-5(g)(2)(B), which limits the applicability of the mixed-motive defense, only applies to a Title VII *discrimination* claim under § 2000e-2(m). By its plain language, it is inapplicable to any other provision, including a Title VII *retaliation* claim under § 2000e-3. Thus, the *Stegall* court was quite correct to assume the mixed-motive defense continues to be a complete bar to liability in a Title VII retaliation action. Today, the majority extends *Stegall*'s holding to § 1981 *retaliation* actions (but *not* to § 1981 *discrimination* actions) and holds mixed motive is a complete defense to liability under a § 1981 retaliation claim.

The majority's decision to re-affirm *Stegall*, but extend § 2000e-5(g)(2)(B) to § 1981 discrimination actions, leads to some puzzling results.[14] First, under the majority's holding, the mixed-motive limitations to Title VII discrimination claims, while inapplicable to Title VII retaliation claims, are applicable to § 1981 discrimination claims. It would seem to defy logic to apply the mixed-motive limitations under § 2000e-5(g)(2)(B) to a § 1981 action, which is situated in a wholly different part of the United States Code, but not to a Title VII retaliation claim under § 2000e-3, which is, after all, a *Title VII* claim itself. Second, there is no reason why mixed motive should be a complete defense to liability in a § 1981 retaliation action, but not in a § 1981 discrimination action. There is nothing in § 1981 that supports this distinction.

---

[14]The majority's conclusion that mixed motive is a complete defense to liability for § 1981 retaliation actions also undermines its earlier conclusion that the mixed-motive defense was only a defense to damages, but not to liability, under § 1981 when the 1991 CRA was enacted. *See supra* note 8.

Third, the majority's extension of § 2000e-5(g)(2)(B) to § 1981 implicitly parts company with our sister circuits that interpret § 2000e-5(g)(2)(B) to be inapplicable to claims brought under the Age Discrimination in Employment Act ("ADEA"). *See Baqir v. Principi*, 434 F.3d 733, 745 n.13 (4th Cir. 2006); *Glanzman v. Metro. Mgmt. Corp.*, 391 F.3d 506, 512 n.3 (3rd Cir. 2004); *Lewis v. Young Men's Christian Ass'n*, 208 F.3d 1303, 1305 (11th Cir. 2000). Even though ADEA actions, like § 1981 actions, are governed by Title VII case law, our sister circuits follow the plain language of § 2000e-5(g)(2)(B) and hold the limitations to the mixed-motive defense do not apply to ADEA claims. *Lewis*, 208 F.3d at 1304-05.

Finally, the majority implicitly departs from our sister circuits which hold the plain language of § 2000e-5(g)(2)(B) is inapplicable to yet other sections of the United States Code. *See Norbeck v. Basin Elec. Power Coop.*, 215 F.3d 848, 852 (8th Cir. 2000) (holding the 1991 CRA did not alter the mixed-motive defense under the False Claims Act and the *Price Waterhouse* mixed-motive analysis governs the claim); *Harris v. Shelby County Bd. of Educ.*, 99 F.3d 1078, 1084 n.5, 1085 (11th Cir. 1996) (holding § 2000e-5(g)(2)(B) is inapplicable to § 1983 actions).[15]

Thus, I would join our sister circuits in holding § 2000e-5(g)(2)(B) is inapplicable to any claim other than a Title VII discrimination action brought under § 2000e-2(m) . . . just as it says.

---

[15]The Eighth Circuit holds § 2000e-5(g)(2)(B) *does* apply to actions brought under the Americans with Disabilities Act ("ADA"). *See Pedigo v. P.A.M. Transp., Inc.*, 60 F.3d 1300, 1301 (8th Cir. 1995). Unlike § 1981, however, the text of the ADA expressly incorporates the "powers, remedies, and procedures" of Title VII, including § 2000e-5. *See* 42 U.S.C. § 12117(a).

## II.

Having concluded § 2000e-5(g)(2)(B) has no impact on § 1981, I now turn to the application of the law to the facts of this case. Because § 2000e-5(g)(2)(B) did not alter the mixed-motive analysis under § 1981, I must analyze this case under the *Price Waterhouse* standard, pursuant to which an employer's mixed motive in making an employment decision remains a complete defense to liability to a § 1981 claim. Accordingly, if the Guild can establish no triable issue of fact exists that it would have fired Metoyer in the absence of any discriminatory motive, the district court's summary judgment for the Guild must be affirmed.

Metoyer asserts three § 1981 claims in her complaint: (1) discriminatory breach of contract for failing to confirm her as the National Director of Affirmative Action; (2) wrongful termination; and (3) retaliation. The majority affirms the district court's summary judgment on the discriminatory breach of contract claim, and I join that holding. However, I disagree with the majority's holding on the retaliation and wrongful termination claims, which reverses the district court's grant of summary judgment for the Guild. I would affirm the district court's summary judgment on all three claims.[16]

---

[16]The majority chooses not to use the *McDonnell Douglas* framework in conducting its analysis. Instead, the majority relies on our decision in *McGinest v. GTE Service Corp.*, 360 F.3d 1103, 1122 (9th Cir. 2004), to forego the *McDonnell Douglas* burden-shifting framework. In *McGinest*, we held "when responding to a summary judgment motion . . . [the plaintiff] may proceed by using the *McDonnell Douglas* framework, or alternatively, may simply produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated [the employer]." *Id.* While the majority is correct that " 'nothing compels the parties to invoke the *McDonnell Douglas* presumption,' " *id.* (citations omitted), where, as here, the plaintiff relied exclusively on the *McDonnell Douglas* framework before the district court, we ought not change to a different standard on appellate review for no apparent reason. **[SER 65:7-10]**. Indeed, we have previously held:

### A.

The majority holds the district court erred in granting summary judgment on the wrongful termination claim because Metoyer presented direct and circumstantial evidence demonstrating that the Guild harbored discriminatory animus toward African-Americans. I disagree. I would affirm the district court's grant of summary judgment for the Guild and hold Metoyer failed to establish a prima facie case of wrongful termination based on discrimination.

To establish a prima facie case of discrimination, Metoyer must show (1) she belongs to a protected class, (2) she was qualified for the position, (3) she was subjected to an adverse employment action, and that (4) similarly situated individuals outside her protected class were treated more favorably. *Aragon v. Republic Silver State Disposal Co.*, 292 F.3d 654, 658 (9th Cir. 2002).

Metoyer fails to establish the fourth element of her prima facie case ("disparate treatment"). To attempt to establish disparate treatment, Metoyer offers solely her own declaration. Therein, Metoyer declares she told John McGuire about the misuse of the Industry Advancement and Cooperation Fund ("IACF") grants by Shawna Brakefield, Sharon Jensen, and Paul Ward, but they were neither investigated nor disciplined. **[ER 38:21-23]**.

---

> Ordinarily, we decline to consider arguments raised for the first time on appeal. This rule serves to ensure that legal arguments are considered with the benefit of a fully developed factual record, offers appellate courts the benefit of the district court's prior analysis, and prevents parties from sandbagging their opponents with new arguments on appeal.

*Dream Palace v. County of Maricopa*, 384 F.3d 990, 1005 (9th Cir. 2004) (citations omitted). Neither Metoyer nor the majority asserts any justification for departing from this general rule. Therefore, I conduct my analysis using the *McDonnell Douglas* framework.

As an initial matter, Metoyer's declaration is insufficient because it does not establish Brakefield, Jensen, and Ward were outside her protected class. The declaration neither identifies their respective races nor states they are all not African American.

Even if I were to assume Brakefield, Jensen, and Ward are Caucasian, as Metoyer's briefs assert, Metoyer's declaration is insufficient because it does not show Brakefield, Jensen, and Ward were "similarly situated [to Metoyer] . . . in all material respects." *Moran v. Selig*, 447 F.3d 748, 755 (9th Cir. 2006); *Vasquez v. County of L.A.*, 349 F.3d 634, 641 (9th Cir. 2004) (holding "individuals are similarly situated when they have similar jobs and display similar conduct"); *id.* at 641 n.17 (citing *Hollins v. Atlantic Co., Inc.,* 188 F.3d 652, 659 (6th Cir. 1999) (holding that, to be similarly situated, an employee must have the same supervisor, be subject to the same standards, and have engaged in the same conduct)). First, Metoyer was a grant administrator, whereas according again to Metoyer, Brakefield, Jensen, and Ward were grant recipients. **[ER 38:23 ("these three grant recipients")].** Metoyer's declaration does not identify who, if anyone, at the Guild administered the Brakefield, Jensen, and Ward grants. Second, unlike Metoyer, who was a Guild employee, Brakefield and Ward were "independent contractors;"[17] Jensen is not identified as either a Guild employee or an independent contractor.[18] **[ER 38:21-2]**. Third, Metoyer's declaration does not establish or even claim Brakefield, Jensen, and Ward (1) violated the Guild's strict policy prohibiting Guild employees from receiving compensation of any kind from IACF funds, or (2) fabricated invoices that had the effect of concealing the

---

[17]Metoyer's declaration does not indicate whether Brakefield and Ward were independent contractors of the Guild or of the IACF.

[18]Of course, as on all elements of a disparate treatment case, the claimant has the burden of showing others were "similarly situated" before she can establish she was treated differently. This burden, Metoyer utterly fails to carry.

true recipient of IACF funds from the Guild. Finally, the declaration shows that in the case of Brakefield, Jensen, and Ward, the Guild was confronted only with suspicions, whereas in Metoyer's case, it was confronted with invoices admitted by Metoyer to have been fabricated from whole cloth by Metoyer personally, or her PRC business partner, Rachelle Bolding.

Accordingly, Metoyer failed to make out a prima facie case of wrongful termination because she failed to establish similarly situated individuals outside her protected class were treated more favorably.[19] Thus, I would affirm the district court's grant of summary judgment for the Guild on Metoyer's wrongful termination claim.

## B.

Metoyer's retaliation claim survives the three-step *McDonnell Douglas* analysis.[20] Nevertheless, I disagree with the majority that the Guild has not presented sufficient evidence to support summary judgment based on the mixed-motive defense. I would affirm the district court's summary judgment for the Guild on the retaliation claim because no triable issue of fact exists as to the Guild's mixed-motive defense.

---

[19]Even if Metoyer established a prima facie case of wrongful termination, the Guild would still be entitled to summary judgment because no triable issue of fact exists as to the Guild's mixed-motive defense. *See infra* Part II.B.

[20]First, the district court held plaintiff established a prima facie case of retaliation, which the Guild does not appeal. Second, the Guild met its burden of asserting a nondiscriminatory reason for Metoyer's termination, namely, Pricewaterhouse Cooper's ("PwC") conclusions that Metoyer transferred the Guild's funds to friends, family, and business partners, and falsified invoices. Third, Metoyer has established a triable issue of fact as to pretext because there is a nexus sufficient for purposes of summary judgment, albeit a tenuous one, between Leonard Chassman's discriminatory remarks and Metoyer's termination.

Under the mixed-motive defense, an employer can avoid liability by establishing that it would have made the same decision absent any discriminatory motive. *See Price Water-house*, 490 U.S. at 244-45. Even though the majority is correct that the mixed-motive inquiry is a factual one, this case presents an unusual set of facts warranting summary judgment for the Guild.

What makes this case fit for summary adjudication is that the underlying facts of Metoyer's misconduct are admitted by Metoyer herself. It is undisputed that the investigation began when Sofia Banks, a temporary employee at the Guild and an African-American woman, discovered a suspicious invoice in Metoyer's inbox. Metoyer admits this invoice was fabricated. As Metoyer testified in her deposition, she had her PRC partner, Rachelle Bolding, create the invoice charging the Guild $10,736 for seven events that never occurred. [*See* ER 46:92-94]. Metoyer then signed a check request listing the same seven events, causing the Guild to transfer $10,736 in Guild funds to LMU to cover Family Fun Fest expenses. **[ER 4:500-01]**. LMU then paid a portion of these funds to Celine Bae, a Guild employee, and to Metoyer's husband's production company.

It is also undisputed that when LMU submitted an invoice to Metoyer for $2,197 in excess Family Fun Fest costs, which listed Bae and Metoyer's husband's company as payees, Metoyer personally fabricated a bogus invoice on LMU letterhead (without mention of Bae or Metoyer's husband) that charged the Guild's IACF trust account $2,197 for a reception in Dr. George Gerbner's honor.[21] Metoyer submitted this bogus invoice, not the one identifying Bae and Metoyer's hus-

---

[21]No separate event honoring Dr. Gerbner was ever held. Rather, although acknowledging that Dr. Gerbner was not in attendance, Metoyer claims Dr. Gerbner was "honored" at the Family Fund Fest. There is no evidence that Dr. Gerbner even knew he was being "honored" or how he was "honored."

band's company as payees, and a signed check request to the Guild's accounting department, causing it to pay $2,197 in IACF funds to LMU.

Similarly, it is undisputed that Metoyer caused Peter Nguyen to receive $5,000 in IACF grant funds for performing legal research and offering legal advice while he was not a licensed attorney. It is also undisputed that Nguyen received this payment while a Guild employee, an apparent[22] violation

---

[22]Metoyer offers no evidence disputing the following facts that suggest she fabricated a consulting job in order to supplement Nguyen's Guild salary with $5,000 in IACF grant funds after the Guild decided not to meet Nguyen's salary demand—which just happened to be $5,000. In 2000, Nguyen was employed in the Guild's Special Projects Division. **[ER 46:18]**. In December 2000, a strike involving the Guild ended and Nguyen's position was eliminated. [*Id.*] Knowing that his position was coming to an end, Metoyer interviewed Nguyen to be her Executive Associate and selected him for the position on December 7, 2000. **[Metoyer's Declaration; ER 46:21]**. Salary negotiations between Jeffery Spencer ("Spencer"), a recruiter in the Guild's human resources department, and Nguyen reached an impasse with Nguyen demanding $55,000 and the Guild offering $50,000. **[ER 46:18]**. Shortly thereafter, on December 28, 2000, Metoyer sent Spencer an e-mail stating, "We have a plan." **[ER 46:23]**.

Five days later, Nguyen submitted a letter to LMU stating: "At the behest of Dr. Patricia Heisser-Metoyer of the Screen Actors Guild, I have rendered legal consultation services in furtherance of the skills bank reorganization project. Please accept this invoice for $5,000 in consideration for such services." **[ER 46:214]**. On January 3, 2001, Nguyen accepted employment as Metoyer's Executive Associate with a start date of January 8, 2001, and a starting salary of $50,000. **[ER 46:212]**. On January 8, 2001, Hope Singer, outside legal counsel for the Guild, met with Metoyer and the Guild's in-house counsel, Vicki Shapiro, regarding the need for a legal opinion on whether it was lawful for the Guild to ask Guild members to identify their race, nationality, gender, disability, and other characteristics on the Skills Bank questionnaire—the same legal question Nguyen requested $5,000 in compensation for researching. **[ER 52:2-3]**. At no time during this meeting did Metoyer indicate Nguyen had been asked to research or actually researched this issue. [*Id.*] Singer researched and analyzed the issue for two hours and informed Shapiro of her conclusion that the questionnaire was in full compliance with the law. [*Id.*] On January 29,

of the Guild's undisputed policy strictly prohibiting Guild employees from receiving compensation from IACF funds. Also undisputed is the fact that Metoyer caused Rachelle Bolding to receive $20,000 in IACF funds shortly after Bolding left the Guild. From the Guild's perspective, the payment to Bolding was particularly egregious because the Guild had reason to believe Bolding and Metoyer were business partners in PRC,[23] an event planning company.

These findings of misconduct were the result of an investigation conducted by PwC, a well-respected third-party accounting firm. PwC was hired by IACF, a separate legal entity from the Guild. The IACF board voted to retain PwC to investigate *all* outstanding grants at a board meeting where the trustees discussed the need for greater accountability of grant funds—in general terms and without naming Metoyer. PwC independently concluded Metoyer made questionable payments to Bae, Nguyen, Bolding, and Metoyer's husband's production company.

Metoyer admitted to all of this misconduct when she was interviewed by two PwC auditors in the presence of her attorney. **[ER 73:115]**. Thus, the facts underlying Metoyer's misconduct—the fabricated invoices, the transfers of funds in violation of the Guild's policies, the lack of documentation for services rendered—are all undisputed. Metoyer contests only the propriety of the transactions, claiming that she was

---

2001, Nguyen received $5,000 in IACF funds for legal consultation services on the same issue, by happenstance the exact sum the Guild was unwilling to add to his salary. Of course, no one contends Metoyer had the authority to overrule Spencer in setting Nguyen's salary.

[23]PwC concluded the first initials of Patricia Metoyer, Rachelle Bolding, and Celine Bae make up the name "PRC." Metoyer admits the "P" in "PRC" is derived from her first name (Patricia). **[ER 38:47-48]**. However, Metoyer disputes she was a business partner in PRC, contending instead that she acted as a mentor and a "big sister" to Rachelle Bolding and Celine Bae in PRC's operations. **[*Id.*]**

authorized to make payments, but does not contest the Guild strictly prohibits current employees from receiving compensation in any form from IACF funds.

After interviewing Metoyer and giving her an opportunity to explain these questionable transactions, the Guild concluded she failed to provide adequate explanations. There is no evidence in the record suggesting either PwC's or the Guild's conclusions were not made in good faith.

Nevertheless, the majority holds three pieces of evidence in the record undermine the Guild's mixed-motive defense and create a triable issue of fact. First, the majority relies on "Metoyer's allegation that other persons engaged in questionable practices related to IACF funds and faced no disciplinary consequences." The "other persons" to which the majority refers are presumably Brakefield, Jensen, and Ward. For the reasons outlined above in Part II.A, however, Brakefield, Jensen, and Ward are not similarly situated to Metoyer and do not provide a valid basis for comparison.

Further, Brakefield, Jensen, and Ward were not investigated because of Metoyer's own refusal to cooperate with an investigation. Following the March 22, 2001, PwC interview where Metoyer claimed Brakefield, Jensen, and Ward had engaged in questionable conduct, John McGuire decided to investigate Metoyer's allegations. **[ER 56:55-6]**. Instead of terminating Metoyer for her theft, McGuire placed her on paid administrative leave and retained O'Melveny & Myers, then completely unaffiliated with the Guild, to investigate Metoyer's claims. **[*Id.*]** Nevertheless, O'Melveny & Myers was unable to make any findings with respect to Metoyer's claims because Metoyer refused to participate in the investigation, "notwithstanding numerous requests that she provide information regarding any and all matters she wanted investigated." **[*Id.*]** McGuire decided to fire Metoyer only after he was informed that O'Melveny & Myers was unable to determine the merits of Metoyer's allegations due to her refusal to

cooperate. **[ER 56:6-7]**. Metoyer now asserts, and the majority holds, there is a triable issue of fact as to the Guild's mixed-motive defense because the Guild did not investigate misconduct by Brakefield, Jensen, and Ward—even though Metoyer herself undermined the investigation. According to the majority, Metoyer can have her cake (thwart the investigation by refusing to cooperate) and eat it too (sue the Guild for the failed investigation).

Second, the majority cites to a written declaration by Ron Thompson, C.P.A., that "there were questions concerning whether the [PwC] investigation truly encompassed all outstanding grants." First, it is axiomatic that asking a question does not establish the facts related in the question. Thompson's "questions" prove nothing, one way or the other. Second, Thompson based his "questions" on the final audit report submitted by PwC, which contained only "the results of [the] grant review for grants managed by" Metoyer. **[ER 4:521]**. The majority fails to explain, however, how this statement evinces any bias on the part of the Guild.

The majority's imputation of bias to the Guild based on the statements in the PwC report is inapposite. PwC was retained by IACF, which is a separate legal entity from the Guild. **[ER 73:12-13, 73:111-12]**. Indeed, the Guild, as a recipient of IACF grants, was the *target* of PwC's investigation, *not* its *overseer*. Thus, the Guild was not in a position to influence PwC's investigation.

Further, Metoyer was not the sole subject of the PwC audit because it is undisputed that PwC ultimately investigated 26 IACF grants, only three of which were administered by Metoyer. **[ER 73:111-12]**. James Hunt ("Hunt"), who was one of the two PwC employees to conduct the audit, stated in a declaration that PwC was not "asked to investigate only Dr. Metoyer's grants, but all grants that had been awarded to the Guild as well as grants that had been awarded to other entities." **[***Id.***]** Bruce Dow, the Administrative Director of the

IACF, stated in his declaration that five other grant administrators at the Guild were investigated, four of whom were Caucasian and one of whom was an African-American woman. **[ER 73:14]**. Hunt stated the reason why the final report detailed misconduct only by Metoyer was because PwC "did not find any signs of questionable expenditures or irregularities with respect to any [other] IACF grants." **[ER 73:112]**.

Finally, the majority also finds support from the statement of Daniel Smith-Christopher, a professor at LMU. The majority reasons that because PwC's interview with Dr. Smith-Christopher focused only on Metoyer, PwC's investigation must have been influenced by discriminatory animus toward Metoyer. The reason why PwC questioned Dr. Smith-Christopher only about Metoyer is simple: PwC found evidence that Metoyer, and only Metoyer, entered into an "escrow agreement"[24] with LMU wrongfully to transfer the Guild's funds. Where there was no evidence suggesting other Guild employees used LMU to engage in misconduct, there was no reason for PwC to question the LMU officials about any other employee.

---

[24]"Escrow" was the term Metoyer applied to the agreement. Of course, it was nothing of the kind. An "escrow" requires a deposit of money pursuant to an agreement that calls for the transfer of the money upon the happening of an event. The escrow holder is a neutral party who takes instructions from both parties to the escrow and in strict adherence to the escrow agreement or instructions. Here, there was (1) no escrow agreement, (2) no second party with an interest in the money that gave instructions; and (3) no deposit of title to property or other action required to cause the escrow holder to transfer funds. LMU was no "escrow holder"; it was a "cut out" used to cover Metoyer's tracks as to who was getting the Guild's money. So long as the payees' names were only at LMU, they were not at the Guild. Anybody looking at the Guild's records would see only "LMU" as a payee. "[T]he only apparent reason to make the transfer to LMU to then receive the invoices and make the payments was to prevent the Guild's Accounting Department from questioning and learning of the true recipients or personal uses of the funds." **[Hunt Declaration, ER 73:118]**.

In short, the majority sees smoke where there is no fire. Based on the foregoing evidence, no triable issue of fact exists that the Guild would have terminated any employee found to have engaged in similar misconduct. Consequently, I would affirm the district court's summary judgment for the Guild on the retaliation claim.

## C.

I also dissent from the majority's reversal of summary judgment on Metoyer's discrimination and retaliation claims under the California Fair Employment and Housing Act ("FEHA"). I agree with the majority that the district court erred in interpreting Metoyer's statement in her supplemental brief on a preemption issue as stipulating to the dismissal of her FEHA claims.

Notwithstanding this error, I would affirm the dismissal of Metoyer's FEHA claims on alternate grounds supported by the record. *Atel Fin. Corp. v. Quaker Coal Co.*, 321 F.3d 924, 926 (9th Cir. 2003) ("We may affirm a district court's judgment on any ground supported by the record, whether or not the decision of the district court relied on the same grounds or reasoning we adopt."). Metoyer's state law discrimination claim fails because, as discussed above in Part II.A, Metoyer has failed to establish a prima facie case of discrimination. *See Tarin v. County of L.A.*, 123 F.3d 1259, 1263 n.2 (9th Cir. 1997) (noting California courts apply the Title VII framework to FEHA claims).

Likewise, I would affirm the district court's grant of summary judgment on Metoyer's FEHA retaliation claims because, as discussed above in Part II.B, no triable issue of fact exists as to the Guild's mixed-motive defense.[25]

---

[25]Although no California court has explicitly adopted the mixed-motive defense as a bar to liability under FEHA, California courts have adopted a jury instruction incorporating that defense. *See* BAJI 12.26 ("If you find

### III.

In sum, the majority got it wrong as to the law and as to the facts. The majority added words to a statute where the words do not exist, and the majority created a triable issue of fact where no triable issue of fact exists. I would affirm the district court's grant of summary judgment for the Guild in its entirety.

I respectfully dissent.

---

that the employer's action, which is the subject of plaintiff's claim, was actually motivated by both discriminatory and non-discriminatory reasons, the employer is not liable if it can establish by a preponderance of the evidence that its legitimate reason, standing alone, would have induced it to make the same decision."). Like § 1981, FEHA places no limitations on the scope of this defense.