**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| NATIONAL ASSOCIATION OF AFRICAN AMERICAN-OWNED MEDIA, a California Limited Liability Company; ENTERTAINMENT STUDIOS NETWORKS, INC., a California corporation, | No. 17-55723 |
| *Plaintiffs-Appellees*, | D.C. No. 2:16-cv-00609-GW-FFM |
| v. | ORDER AND OPINION |
| CHARTER COMMUNICATIONS, INC., a Delaware corporation, *Defendant-Appellant.* | |

Appeal from the United States District Court
for the Central District of California
George H. Wu, District Judge, Presiding

Argued and Submitted October 9, 2018
Pasadena, California

Filed February 4, 2019

Before: MARY M. SCHROEDER, MILAN D. SMITH, JR., and JACQUELINE H. NGUYEN, Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.

# SUMMARY[*]

## Civil Rights

The panel filed (1) an order withdrawing its prior opinion and denying, on behalf of the court, a petition for rehearing en banc, and (2) a superseding opinion affirming the district court's denial of a cable television-distribution company's motion to dismiss a claim that its refusal to enter into a carriage contract with an African American-owned operator of television networks was racially motivated, and in violation of 42 U.S.C. § 1981.

In the superseding opinion, reconsidering the court's approach to the causation standard for § 1981 claims under *Metoyer v. Chassman*, 504 F.3d 919 (9th Cir. 2007), following the Supreme Court's decisions in *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009), and *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013), the panel held that a plaintiff need not plead that racial discrimination was the but-for cause of a defendant's conduct, but only that racial discrimination was a factor in the decision not to contract such that the plaintiff was denied the same right as a white citizen. The panel concluded that *Gross* and *Nassar* undercut *Metoyer*'s approach of borrowing the causation standard of Title VII's discrimination provision. The panel instead looked to the text of § 1981, and it held that mixed-motive claims are cognizable under § 1981.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that the plaintiffs' allegations regarding the defendant's treatment of the African American-owned operator, and its differing treatment of white-owned companies, were sufficient to state a viable claim pursuant to § 1981.

The panel also held that plaintiffs' § 1981 claim was not barred by the First Amendment. The panel concluded that the fact that cable operators engage in expressive conduct when they select which networks to carry did not automatically require the application of strict scrutiny. The panel concluded that at most intermediate scrutiny applied, and § 1981 would satisfy intermediate scrutiny because it was a content-neutral statute and was narrowly tailored to serve a significant government interest in preventing racial discrimination.

The panel remanded the case for further proceedings.

---

## COUNSEL

Patrick Francis Philbin (argued), Devin S. Anderson, Jeffrey S. Powell, and Paul D. Clement, Kirkland & Ellis LLP, Washington, D.C.; Mark C. Holscher, Kirkland & Ellis LLP, Los Angeles, California; for Defendant-Appellant.

Erwin Chemerinsky (argued), Boalt Hall, University of California, Berkeley, California; David W. Schecter, J. Mira Hashmall, Brian A. Procel, and Louis R. Miller, Miller Barondess LLP, Los Angeles, California; for Plaintiffs-Appellees.

John Bergmayer, Public Knowledge, Washington, D.C., for Amicus Curiae Public Knowledge.

Gregory G. Garre and Charles S. Dameron, Latham & Watkins LLP, Washington, D.C.; Daryl Joseffer and Jonathan Urick, U.S. Chamber Litigation Center, Washington, D.C.; for Amicus Curiae Chamber of Commerce of the United States of America.

---

## ORDER

Defendant-Appellant's petition for panel rehearing is GRANTED.  The opinion filed November 19, 2018, and reported at 908 F.3d 1190, is hereby withdrawn.  A superseding opinion will be filed concurrently with this order.

Judge M. Smith and Judge Nguyen vote to deny the petition for rehearing en banc, and Judge Schroeder so recommends.  The full court has been advised of the petition for rehearing en banc, and no judge of the court has requested a vote on it.  Fed. R. App. P. 35.  The petition for rehearing en banc is DENIED.  No further petitions for panel rehearing or rehearing en banc will be entertained.

---

## OPINION

M. SMITH, Circuit Judge:

Plaintiff-Appellee Entertainment Studios Networks, Inc. (Entertainment Studios), an African American-owned operator of television networks, sought to secure a carriage contract from Defendant-Appellant Charter Communications, Inc. (Charter).  These efforts were unsuccessful, and Entertainment Studios, along with Plaintiff-Appellee

National Association of African American-Owned Media (NAAAOM, and together with Entertainment Studios, Plaintiffs), claimed that Charter's refusal to enter into a carriage contract was racially motivated, and in violation of 42 U.S.C. § 1981. The district court, concluding that Plaintiffs' complaint sufficiently pleaded a § 1981 claim and that the First Amendment did not bar such an action, denied Charter's motion to dismiss. The court then certified that order for interlocutory appeal. We have jurisdiction pursuant to 28 U.S.C. § 1292(b), and we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Factual Background

Entertainment Studios is a full-service television and motion picture company owned by Byron Allen, an African-American actor, comedian, and entrepreneur. It serves as both a producer of television series and an operator of television networks, and currently operates seven channels and distributes thousands of hours of programming.

Entertainment Studios relies on cable operators like Charter for "carriage contracts"; these operators, which range from local cable companies to nationwide enterprises, carry and distribute channels and programming to their television subscribers. Although Entertainment Studios managed to secure carriage contracts with more than 50 operators—including prominent distributors like Verizon, AT&T, and DirecTV—it was unable to reach a similar agreement with Charter, the third-largest cable television-distribution company in the United States, despite efforts that began in 2011.

From 2011 to 2016, Charter's senior vice president of programming, Allan Singer, declined to meet with

Entertainment Studios representatives or consider its channels for carriage. Plaintiffs alleged that, instead of engaging in a meaningful discussion regarding a potential carriage contract, Singer and Charter repeatedly refused, rescheduled, and postponed meetings, encouraging Entertainment Studios to exercise patience and proffering disingenuous explanations for its refusal to contract. Although Singer stated that Charter was not launching any new channels and that bandwidth and operational demands precluded carriage opportunities, Plaintiffs claimed that Charter nonetheless negotiated with other, white-owned networks during the same period, and also secured carriage agreements with The Walt Disney Company and Time Warner Cable Sports. Charter allegedly communicated that it did not have faith in Entertainment Studios' "tracking model," despite contracting with other white-owned media companies that used the same tracking model. Plaintiffs also asserted that Singer blocked a meeting between Entertainment Studios and Charter CEO Tom Rutledge because the latter "does not meet with programmers," despite the fact that Rutledge regularly met with the CEOs of white-owned programmers, such as Viacom's Philippe Dauman. Singer was allegedly steadfast in his opposition to Entertainment Studios, saying, "Even if you get support from management in the field, I will not approve the launch of your network."

Plaintiffs claimed that they finally managed to secure a meeting with Singer in July 2015. However, during the meeting at Charter's headquarters in Stamford, Connecticut, Singer once again made clear that Entertainment Studios would not receive a carriage contract, citing a series of allegedly insincere explanations for this decision. For example, Singer informed Entertainment Studios that he wanted to wait and "see what AT&T does," despite the fact

that AT&T already carried one of Entertainment Studios' networks. Charter also mentioned its purported lack of bandwidth, even though at that time, it expanded the distribution of two lesser-known, white-owned channels into major media markets: RFD-TV, a network focused on rural and Western lifestyles, and CHILLER, a horror channel.

In addition to recounting Entertainment Studios' failed negotiations with Charter, Plaintiffs' amended complaint also included direct evidence of racial bias. In one instance, Singer allegedly approached an African-American protest group outside Charter's headquarters, told them "to get off of welfare," and accused them of looking for a "handout." Plaintiffs asserted that, after informing Charter of these allegations, it announced that Singer was leaving the company. In another alleged instance, Entertainment Studios' owner, Allen, attempted to talk with Charter's CEO, Rutledge, at an industry event; Rutledge refused to engage, referring to Allen as "Boy" and telling Allen that he needed to change his behavior. Plaintiffs suggested that these incidents were illustrative of Charter's institutional racism, noting also that the cable operator had historically refused to carry African American-owned channels and, prior to its merger with Time Warner Cable, had a board of directors composed only of white men. The amended complaint further alleged that Charter's recently pronounced commitments to diversity were merely illusory efforts to placate the Federal Communications Commission (FCC).

## II. Procedural Background

Plaintiffs initiated this action on January 27, 2016, asserting both a claim against Charter under § 1981 and a claim against the FCC under the due process clause of the

Fifth Amendment.[1]  After learning of the derogatory racial comments allegedly made by Singer and Rutledge, Plaintiffs sought leave to file a first amended complaint (FAC), which the district court granted.  The FAC alleged one claim against Charter for racial discrimination in contracting in violation of § 1981.

Charter moved to dismiss the FAC, arguing that it failed to plead that racial animus was the but-for cause of Charter's conduct and that the First Amendment barred a § 1981 claim based on a cable operator's editorial discretion.  The district court denied the motion.  It determined that, under *Metoyer v. Chassman*, 504 F.3d 919 (9th Cir. 2007), Plaintiffs needed only to plead that racism was a *motivating factor* in Charter's decision, not the *but-for* cause—a requirement, the court concluded, that Plaintiffs satisfied.  Addressing Charter's contention that *Metoyer* was no longer good law following two subsequent Supreme Court decisions, the district court concluded that "if *Metoyer* is no longer good law on this point, [then] the Ninth Circuit [] should announce that conclusion."  As for Charter's First Amendment challenge, the district court allowed that the cable operator's "ultimate carriage/programming activity is entitled to some measure of First Amendment protection," but declined to apply strict scrutiny and bar the § 1981 claim.

Subsequently, Charter moved for certification of the district court's order under 28 U.S.C. § 1292(b), which the district court granted.  This appeal followed.

---

[1] Plaintiffs voluntarily dismissed their claim against the FCC before filing their first amended complaint.

**STANDARD OF REVIEW AND JURISDICTION**

"We review de novo a district court order denying a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6)." *Fortyune v. City of Lomita*, 766 F.3d 1098, 1101 (9th Cir. 2014). We have jurisdiction pursuant to 28 U.S.C. § 1292(b).[2]

**ANALYSIS**

"Section 1981 offers relief when racial discrimination blocks the creation of a contractual relationship." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006). The statute provides that "[a]ll persons . . . shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens . . . ." 42 U.S.C. § 1981(a). It further defines "make and enforce contracts" as including "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Id.* § 1981(b). The Supreme Court has emphasized that § 1981 reaches both public and "purely private acts of racial discrimination." *Runyon v. McCrary*,

---

[2] "A non-final order may be certified for interlocutory appeal where it 'involves a controlling question of law as to which there is substantial ground for difference of opinion' and where 'an immediate appeal from the order may materially advance the ultimate termination of the litigation.'" *Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 687–88 (9th Cir. 2011) (quoting 28 U.S.C. § 1292(b)). "Although we defer to the ruling of the motions panel granting an order for interlocutory appeal, 'we have an independent duty to confirm that our jurisdiction is proper.'" *Id.* at 688 (quoting *Kuehner v. Dickinson & Co.*, 84 F.3d 316, 318–19 (9th Cir. 1996)). Here, we are satisfied that the district court and the motions panel of this court correctly concluded that certification under § 1292(b) was appropriate.

427 U.S. 160, 170 (1976); *see also* 42 U.S.C. § 1981(c) ("The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law."). However, it "reaches only *purposeful* discrimination." *Gen. Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 389 (1982) (emphasis added).[3]

Charter advances three primary arguments on appeal: the district court applied the wrong causation standard to Plaintiffs' § 1981 claim; Plaintiffs' FAC failed to plead a plausible claim; and the First Amendment bars a § 1981 claim premised on a cable operator's editorial decisions. We will consider each of these arguments in turn.

## I.  Causation Standard

Charter argues that the Supreme Court's decisions in two discrimination cases require us to apply a but-for causation standard to § 1981 claims. Although we agree that these precedents necessitate reconsideration of our § 1981 approach, we disagree that the but-for causation standard should be applied.

---

[3] Although the Supreme Court has not squarely decided whether a corporation may bring suit under § 1981, *see Domino's Pizza*, 546 U.S. at 473 n.1, we have held that a corporation may do so when it "has acquired an imputed racial identity." *Thinket Ink Info. Res., Inc. v. Sun Microsystems, Inc.*, 368 F.3d 1053, 1058–59 (9th Cir. 2004). Thus, as a "100% African American-owned" company that is a "bona fide Minority Business Enterprise," Entertainment Studios can bring a § 1981 claim, even though it is a corporation and not an individual.

## A.  *Metoyer* and the Motivating Factor Standard

In the past, we have held that "the same legal principles as those applicable in a Title VII disparate treatment case" govern a § 1981 claim.  *Metoyer*, 504 F.3d at 930 (quoting *Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 850 (9th Cir. 2004)).  "In a Title VII discrimination case, even an employer who can successfully prove a mixed-motive defense, i.e., he would have made the same decision regarding a particular person without taking race or gender into account, does not escape liability."  *Id.* at 931; *see also* 42 U.S.C. § 2000e-2(m) (providing that a plaintiff can prevail in a Title VII disparate treatment case by showing "that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice").  Accordingly, we previously ruled that a § 1981 defendant may be held liable even if it had a legitimate reason for its refusal to contract, so long as racial discrimination was a *motivating factor* in that decision.

## B.  *Gross* and *Nassar*

Charter correctly notes that two Supreme Court decisions cast doubt on the propriety of our application of the Title VII standard to § 1981 claims.  In these two cases, the Supreme Court departed from application of the Title VII motivating factor standard, and instead endorsed a but-for causation requirement as applied to two federal statutes: the Age Discrimination in Employment Act (ADEA), *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177–78 (2009), and retaliation claims brought under Title VII, *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362–63 (2013).  In *Gross*, the Court admonished that "[w]hen conducting statutory interpretation, we 'must be careful not to apply rules applicable under one statute to a different statute without

careful and critical examination.'" *Gross*, 557 U.S. at 174 (quoting *Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 393 (2008)). That examination did not center on the shared objectives of the statute at issue there and Title VII's antidiscrimination provision—the approach that this court employed in *Metoyer* and its antecedents with regard to § 1981—but instead focused on the statute's text and history:

> Unlike Title VII, the ADEA's text does not provide that a plaintiff may establish discrimination by showing that age was simply a motivating factor. Moreover, Congress neglected to add such a provision to the ADEA when it amended Title VII . . . .

> Our inquiry therefore must focus on the text of the ADEA to decide whether it authorizes a mixed-motives age discrimination claim.

*Id.* at 174–75. In *Nassar*, the Court expanded upon this textual analysis, explaining that

> [i]n the usual course, [the causation] standard requires the plaintiff to show "that the harm would not have occurred" in the absence of— that is, but for—the defendant's conduct. . . . This, then, is the background against which Congress legislated in enacting Title VII, and these are the default rules it is presumed to have incorporated, absent an indication to the contrary in the statute itself.

570 U.S. at 346–47.

In both cases, after analyzing the relevant statutory texts, the Court endorsed the use of a default, but-for causation standard in the application of the statutes being construed—a standard from which courts may depart only when the text of a statute permits. *See Gross*, 557 U.S. at 175 n.2 ("[T]he textual differences between Title VII and the ADEA [] prevent us from applying [the motivating factor standard] to federal age discrimination claims."); *Nassar*, 570 U.S. at 352 ("Given the lack of any meaningful textual difference between the text in this statute and the one in *Gross*, the proper conclusion here, as in *Gross*, is that Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action.").**[4]**

We conclude that *Metoyer* does not emerge from *Gross* and *Nassar* unscathed. We premised our opinion in *Metoyer* on a determination that "an '[a]nalysis of an employment discrimination claim under § 1981 follows the same legal principles as those applicable in a Title VII disparate treatment case.'" *Metoyer*, 504 F.3d at 934 (alteration in original) (quoting *Fonseca*, 374 F.3d at 850). That opinion

---

**[4]** Plaintiffs argue that *Gross* and *Nassar* have no bearing here because of the textual differences between the ADEA, the Title VII retaliation provision, and § 1981. We disagree. Although it is true that the use of the word "because"—which does not appear in § 1981—drove the Court's *results* in those cases, *see Gross*, 557 U.S. at 176–78; *Nassar*, 570 U.S. at 352, the decisions do not hold that the preceding *inquiry* only occurs in cases where a statute features the word "because" or other similar language. Indeed, in *Nassar*, the Court cautioned against reading *Gross* in too narrow a manner. *Nassar*, 570 U.S. at 351 ("In *Gross*, the Court was careful to restrict its analysis to the statute before it and withhold judgment on the proper resolution of a case, such as this, which arose under Title VII rather than the ADEA. But the particular confines of *Gross* do not deprive it of all persuasive force.").

followed a line of cases in which this court applied Title VII's causation standard to § 1981 cases because both statutes sought to combat intentional discrimination.[5] This approach is incompatible with *Gross*, which suggests that, rather than borrowing the causation standard from Title VII's disparate treatment provision and applying it to § 1981 because both are antidiscrimination statutes, we must instead focus on the text of § 1981 to see if it permits a mixed-motive claim. *See Gross*, 557 U.S. at 174–75.[6]

## C.  Departing from *Metoyer*

Although not addressed by the parties, a departure from *Metoyer* is permissible here under our opinion in *Miller v. Gammie*, which held that a higher court ruling is controlling when it has "undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable." 335 F.3d 889, 900 (9th Cir. 2003) (en banc).

---

[5] *See, e.g.*, *Fonseca*, 374 F.3d at 850 ("Analysis of an employment discrimination claim under § 1981 follows the same legal principles as those applicable in a Title VII disparate treatment case.  Both require proof of discriminatory treatment and the same set of facts can give rise to both claims." (citation omitted)); *Manatt v. Bank of Am., NA*, 339 F.3d 792, 797–98 (9th Cir. 2003) ("We also recognize that those legal principles guiding a court in a Title VII dispute apply with equal force in a § 1981 action."); *EEOC v. Inland Marine Indus.*, 729 F.2d 1229, 1233 n.7 (9th Cir. 1984) ("A plaintiff must meet the same standards in proving a § 1981 claim that he must meet in establishing a disparate treatment claim under Title VII; that is, he must show discriminatory intent." (citing *Gen. Bldg. Contractors Ass'n*, 458 U.S. at 391)).

[6] As another circuit court has concluded, "No matter the shared goals and methods of two laws, [*Gross*] explains that we should not apply the substantive causation standards of one anti-discrimination statute to other anti-discrimination statutes when Congress uses distinct language to describe the two standards." *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 318–19 (6th Cir. 2012) (en banc).

*Gross* and *Nassar* are fairly clear that our approach in *Metoyer*—borrowing the causation standard of Title VII's discrimination provision and applying it to § 1981 due to the statutes' shared objectives, without considering § 1981's text—is not permitted. *See Nassar*, 570 U.S. at 350–51; *Gross*, 557 U.S. at 175–75 ("Our inquiry therefore must focus *on the text of the ADEA* to decide whether it authorizes a mixed-motives age discrimination claim." (emphasis added)).

Furthermore, in *Gross*, the Supreme Court determined that borrowing the Title VII causation standard was inappropriate in ADEA cases because 1) unlike Title VII's disparate treatment provision, the text of the ADEA did not explicitly provide that "a plaintiff may establish discrimination by showing that [the protected characteristic] was simply a motivating factor," and 2) the ADEA was not amended to include a motivating factor standard even though it was amended contemporaneously with Title VII.  557 U.S. at 174–75.  Because § 1981 shares these two characteristics with the ADEA,**[7]** and because the Court determined that Title VII's standard could not be adopted in the ADEA context, *Gross* alone undermines *Metoyer* to the point of irreconcilability.

### D.  Section 1981's Text

Accordingly, rather than adopting Title VII's motivating factor standard in this case, we must instead look to the text

---

**[7]** Like Title VII and the ADEA, § 1981 was amended as part of the Civil Rights Act of 1991.  *See* Pub. L. No. 102-166, 105 Stat. 1071, 1071–72 (1991).

of § 1981 to determine whether it permits a departure from the but-for causation standard.

Section 1981 guarantees "the same right" to contract "as is enjoyed by white citizens." 42 U.S.C. § 1981(a). This is distinctive language, quite different from the language of the ADEA and Title VII's retaliation provision, both of which use the word "because" and therefore explicitly suggest but-for causation. Charter contends that the most natural understanding of the "same right" language is also but-for causation. We disagree and are persuaded by the reasoning of the Third Circuit in *Brown v. J. Kaz, Inc.*, 581 F.3d 175 (3d Cir. 2009). There, albeit in dicta and without formally resolving the issue, the court reasoned that "[i]f race plays any role in a challenged decision by a defendant, the plain terms of the statutory text suggest the plaintiff has made out a prima facie case that section 1981 was violated because the plaintiff has not enjoyed 'the same right' as other similarly situated persons." *Id.* at 182 n.5; *see also St. Ange v. ASML, Inc.*, No. 3:10-cv-00079-WWE, 2015 WL 7069649, at *2 (D. Conn. Nov. 13, 2015) ("Where race discrimination is a motivating factor in an adverse employment decision, the subject of the discrimination has not enjoyed the same right to the full and equal benefit of the law.").

If discriminatory intent plays *any* role in a defendant's decision not to contract with a plaintiff, even if it is merely one factor and not the sole cause of the decision, then that plaintiff has not enjoyed the *same right* as a white citizen. This, we conclude, is the most natural reading of § 1981. Therefore, unlike the ADEA or Title VII's retaliation provision, § 1981's text permits an exception to the default but-for causation standard by virtue of "an indication to the contrary in the statute itself." *Nassar*, 570 U.S. at 347.

Accordingly, mixed-motive claims are cognizable under § 1981. Even if racial animus was not the but-for cause of a defendant's refusal to contract, a plaintiff can still prevail if she demonstrates that discriminatory intent was a factor in that decision such that she was denied the same right as a white citizen.

## II.  Plausibility of Plaintiffs' § 1981 Claim

Having determined that a plaintiff in a § 1981 action need only prove that discriminatory intent was a factor in—and not necessarily the but-for cause of—a defendant's refusal to contract, we must now determine whether Plaintiffs pleaded a plausible claim for relief in their FAC. We conclude that they did. Plaintiffs' allegations regarding Charter's treatment of Entertainment Studios, and its differing treatment of white-owned companies, are sufficient to state a viable claim pursuant to § 1981.

### A.  Allegations of Disparate Treatment

Plaintiffs' FAC alleged various instances of contradictory, disingenuous, and disrespectful behavior on the part of Charter and its executives. These allegations include: a pattern of declining and delaying meetings with Entertainment Studios, combined with a refusal to contract despite presenting intimations to the contrary; the offering of "provably false" explanations for its reluctance to carry Entertainment Studios' channels; and Singer's repeated misleading and insulting communications with Entertainment Studios. We acknowledge that, even when considered in the light most favorable to Plaintiffs, these claims alone would not constitute a plausible § 1981 claim. Corporate red tape, inconsistent decision-making among network leadership, and even boorish executives are not themselves necessarily indicative of discrimination.

However, Plaintiffs supplemented these claims by pleading that white-owned companies were not treated similarly. For example, the FAC stated that, although Charter informed Entertainment Studios that bandwidth and operational demands prevented carriage of the latter's channels, Charter secured contracts with "white-owned, lesser-known" networks during the same period.[8] Charter also allegedly pointed to Entertainment Studios' tracking model as a ground for refusing to contract, while simultaneously accepting white-owned channels that used the same model. Plaintiffs further alleged that Charter's CEO, Rutledge, refused to meet with Entertainment Studios' African-American owner, Allen, despite meeting with the heads of white-owned programmers during the same time

---

[8] Charter argues that we cannot infer disparate treatment from these allegations because "[t]he complaint fails to allege any facts whatsoever showing that [Entertainment Studios'] channels are 'similarly situated' to the channels Charter added (or expanded) in respects such as content, quality, popularity, viewer demand, or any objective metric relevant to a carriage decision." It is true that, in order for us to infer discriminatory intent from these allegations of disparate treatment, we would need to conclude that the white-owned channels were similarly situated to Entertainment Studios'. *See, e.g.*, *Lindsey v. SLT L.A., LLC*, 447 F.3d 1138, 1147 (9th Cir. 2006). It is also true that television networks can vary widely in terms of content, quality, and appeal. *See Herring Broad., Inc. v. FCC*, 515 F. App'x 655, 656–57 (9th Cir. 2013) (exploring various ways in which television networks can differ). However, such a thorough comparison of channels would require a factual inquiry that is inappropriate in reviewing a 12(b)(6) motion. *See Earl v. Nielsen Media Research, Inc.*, 658 F.3d 1108, 1114–15 (9th Cir. 2011) (describing the fact-intensive, context-dependent analysis needed to determine whether individuals are similarly situated in the related context of employment discrimination). At this stage of the litigation, we must accept as true Plaintiffs' assertions that other, lesser-known, white-owned networks were selected for carriage at the same time that Charter refused to carry Entertainment Studios' offerings.

period.  We conclude that these allegations, when accepted as true and viewed in the light most favorable to Plaintiffs, are sufficient under § 1981 to plausibly claim that Charter denied Entertainment Studios the same right to contract as white-owned companies.[9]

## B.  Charter's Race-Neutral Explanations

Charter contends that we cannot ignore the legitimate, race-neutral explanations for its conduct that are, admittedly, present on the face of the FAC.  These business justifications include limited bandwidth, timing concerns, and other operational considerations.  However, at this stage, we are not permitted to weigh evidence and determine whether the explanations proffered by Plaintiffs or Charter are ultimately more persuasive.  Instead, we have explained that "[i]f there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6).  Plaintiff's complaint may be dismissed only when defendant's plausible alternative explanation is so convincing that plaintiff's explanation is *im*plausible." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

---

[9] Furthermore, Plaintiffs' FAC also included direct allegations of racial animus: specifically, the racially charged comments allegedly made by Singer and Rutledge, both of whom were high-ranking Charter decision-makers.  Notably, neither of these incidents occurred in the context of Entertainment Studios' attempts to secure a carriage contract with Charter, and they can therefore serve only as circumstantial evidence of discriminatory animus.  *See, e.g.*, *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998); *Nesbit v. Pepsico, Inc.*, 994 F.2d 703, 705 (9th Cir. 1993).  However, circumstantial evidence of discrimination is still evidence, and is particularly compelling here when combined with the allegations of disparate treatment contained elsewhere in the FAC.

Here, it is plausible that Charter's conduct was attributable wholly to legitimate, race-neutral considerations. But we cannot conclude, based only on the allegations in the FAC, construed in the light most favorable to Plaintiffs, that those alternative explanations are so compelling as to render Plaintiffs' allegations of discriminatory intent *im*plausible. This is especially true given that Plaintiffs' allegations of disparate treatment and disingenuous statements suggest that Charter's race-neutral explanations lack credibility. *See Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003) ("[E]vidence that a defendant's explanation for an employment practice is 'unworthy of credence' is 'one form of *circumstantial evidence* that is probative of intentional discrimination.'" (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000))). In short, we can infer from the allegations in the FAC that discriminatory intent played at least some role in Charter's refusal to contract with Entertainment Studios, thus denying the latter the same right to contract as a white-owned company. Charter's race-neutral explanations for its conduct are not so convincing as to render Plaintiffs' theory implausible.**[10]**

---

**[10]** Charter also relies in part on *In re Century Aluminum Co. Securities Litigation*, in which we held that

> [w]hen faced with two possible explanations, only one of which can be true and only one of which results in liability, plaintiffs cannot offer allegations that are "merely consistent with" their favored explanation but are also consistent with the alternative explanation. Something more is needed, such as facts tending to exclude the possibility that the alternative explanation

## III.     First Amendment

Finally, Charter argues that Plaintiffs' § 1981 claim is barred by the First Amendment because laws of general applicability cannot be used "to force cable companies to accept channels they do not wish to carry." We disagree and conclude that the First Amendment does not bar Plaintiffs' claim.[11]

---

is true, in order to render plaintiffs' allegations plausible within the meaning of *Iqbal* and *Twombly*.

729 F.3d 1104, 1108 (9th Cir. 2013) (citations omitted) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). However, *Century Aluminum* is not particularly persuasive here because we are not confronted with two mutually exclusive possibilities. It is entirely possible that Charter was motivated by both race-neutral business concerns *and* discriminatory intent—a scenario that, given the applicable causation standard, would still give rise to a viable claim under § 1981. Because both parties' explanations can logically coexist, we conclude that *Starr*, not *Century Aluminum*, provides the proper framework for our analysis. Plaintiffs therefore do not need to provide facts "tending to exclude" Charter's theory of the case; it is sufficient under *Starr* that Plaintiffs' explanation is not implausible.

[11] We note that our analysis here is limited to cases of discriminatory contracting based on a plaintiff's *race*, not contracting based on a plaintiff's *viewpoint*. A bookstore's choice of which books to stock on its shelves, or a theater owner's decision about which productions to stage, or a cable operator's selection of certain perspectives to air, are decisions based on content, and not necessarily on the racial identities of the parties with which they contract (or refuse to contract). Here, by contrast, Plaintiffs plausibly pleaded that Charter refused to contract with Entertainment Studios due to racial animus, and they must ultimately prove that Entertainment Studios' racial identity, separate and apart from the underlying content of its programming, was a factor in Charter's decision. Accordingly, our First Amendment analysis is limited to cases involving racially discriminatory contracting that incidentally impacts

The Supreme Court has held that "[c]able programmers and cable operators engage in and transmit speech, and they are entitled to the protection of the speech and press provisions of the First Amendment." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 636 (1994); *see also Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 570 (1995) ("Cable operators . . . are engaged in protected speech activities even when they only select programming originally produced by others."). Because Plaintiffs' claim implicates the First Amendment, we must determine the appropriate standard of review for our analysis.

Here, there is some ambiguity as to whether rational basis review or a heightened form of scrutiny ought to be applied. Normally, laws of general applicability that regulate *conduct* and not *speech*—such as § 1981—trigger only rational basis review. *See, e.g.*, *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 62 (2006) ("Congress . . . can prohibit employers from discriminating in hiring on the basis of race. The fact that this will require an employer to take down a sign reading 'White Applicants Only' hardly means that the law should be analyzed as one regulating the employer's speech rather than conduct."); *Cohen v. Cowles Media Co.*, 501 U.S. 663, 670–71 (1991) (permitting application of a generally applicable law that had an incidental effect on speech and contrasting it with laws that "define[] the content of publications that would trigger liability").

---

speech, and should not be construed as applying to cases where a refusal to contract is instead based solely on the viewpoint or substance of a plaintiff's content or message.

In *Hurley*, however, the Supreme Court explained that even generally applicable laws directed at conduct rather than speech *might* implicate the First Amendment "[w]hen the law is applied to expressive activity" in a way that "require[s] speakers to modify the content of their expression to whatever extent beneficiaries of the law choose to alter it with messages of their own." 515 U.S. at 578; *see also Turner Broad.*, 512 U.S. at 640–41 (noting that "the enforcement of a generally applicable law may or may not be subject to heightened scrutiny under the First Amendment" and contrasting *Cohen*, where enforcement of a law did not directly impact expressive conduct, with *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 566–67 (1991), where expressive conduct was directly implicated). Here, we conclude that resolution of this issue is not required, since Plaintiffs' § 1981 claim survives even a heightened standard of review.

Contrary to Charter's position, the fact that cable operators engage in expressive conduct when they select which networks to carry does *not* automatically require the application of strict scrutiny in this case. If § 1981 is a content-neutral statute, then, at most, it would be subject to intermediate scrutiny. *See Turner Broad.*, 512 U.S. at 642 ("[R]egulations that are unrelated to the content of speech are subject to an intermediate level of scrutiny."). Accordingly, § 1981 would pass muster under the First Amendment if it is content-neutral and if "it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Id.* at 662 (quoting *United States v. O'Brien*, 391 U.S. 367, 377 (1968)).

## A.  Content Neutrality

Section 1981 does not seek to regulate the *content* of Charter's conduct, but only the manner in which it reaches its editorial decisions—which is to say, free of discriminatory intent.  It is therefore "justified without reference to the content of the regulated speech."  *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984).  Just as "[n]othing in the [statute]" at issue in *Turner Broadcasting* "imposes a restriction, penalty, or burden by reason of the views, programs, or stations the cable operator has selected or will select," 512 U.S. at 644, nothing in § 1981 punishes a defendant for the content of its programming.  Section 1981 prohibits Charter from discriminating against networks on the basis of race.  This prohibition has no connection to the viewpoint or content of any channel that Charter chooses or declines to carry.  *See Alpha Delta Chi-Delta Chapter v. Reed*, 648 F.3d 790, 801 (9th Cir. 2011) ("[A]ntidiscrimination laws intended to ensure equal access to the benefits of society serve goals 'unrelated to the suppression of expression' and are neutral as to both content and viewpoint."  (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 624 (1984))).  Because it does not rely upon the content of Charter's expressive conduct, § 1981 is content-neutral.

## B.  Narrow Tailoring and Government Interest

Next, to satisfy intermediate scrutiny, a content-neutral statute must be "narrowly tailored to serve a significant governmental interest."  *Clark*, 468 U.S. at 293.  The Supreme Court has regularly emphasized that the prevention of racial discrimination is a compelling government interest.  *See, e.g.*, *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2783 (2014) ("The Government has a compelling interest in providing an equal opportunity to participate in

the workforce without regard to race, and prohibitions on racial discrimination are precisely tailored to achieve that critical goal."); *Bob Jones Univ. v. United States*, 461 U.S. 574, 604 (1983) ("[T]he Government has a fundamental, overriding interest in eradicating racial discrimination in education.").  The Court has emphasized that this significant interest applies even when expressive activities are impacted:

> [A]cts of invidious discrimination in the distribution of publicly available goods, services, and other advantages cause unique evils that government has a compelling interest to prevent—wholly apart from the point of view such conduct may transmit. Accordingly, like violence or other types of potentially expressive activities that produce special harms distinct from their communicative impact, such practices are entitled to no constitutional protection.

*Roberts*, 468 U.S. at 628.  Thus, there can be little doubt that § 1981, which is part of a "longstanding civil rights law, first enacted just after the Civil War" to "guarantee the then newly freed slaves the same legal rights that other citizens enjoy," *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 445, 448 (2008), serves a significant government interest, and one that is "unrelated to the suppression of free expression." *Turner Broad.*, 512 U.S. at 662 (quoting *O'Brien*, 391 U.S. at 377).

As for whether § 1981 is narrowly tailored to that interest—in other words, whether "the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest," *id.* at 662

(quoting *O'Brien*, 391 U.S. at 377)—there can be no dispute that the statute "promotes a substantial government interest that would be achieved less effectively absent the regulation," which satisfies the requirement of narrow tailoring. *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989) (quoting *United States v. Albertini*, 472 U.S. 675, 689 (1985)). Such regulations are not "invalid simply because there is some imaginable alternative that might be less burdensome on speech." *Albertini*, 472 U.S. at 689. Section 1981 does not restrict more speech than necessary; it prohibits *all* racial discrimination in contracting, and the Supreme Court has noted that "[a] complete ban can be narrowly tailored, but only if each activity within the proscription's scope is an appropriately targeted evil." *Frisby v. Schultz*, 487 U.S. 474, 485 (1988). Here, the *only* activity within § 1981's ambit is discriminatory contracting, which is, indisputably, an appropriately targeted evil. Therefore, § 1981 is narrowly tailored and would survive intermediate scrutiny.

In summation, as with the statute analyzed in *Turner Broadcasting*, § 1981 is a content-neutral regulation that would satisfy even intermediate scrutiny as set forth in *O'Brien* and its progeny. Therefore, the First Amendment does not bar Plaintiffs' § 1981 claim.

## CONCLUSION

We AFFIRM the district court's order denying Charter's motion to dismiss, and REMAND for further proceedings. We also DENY Plaintiffs' motion to take judicial notice.